## CENTRAL MAINE POWER COMPANY

v.

## MAINE PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued Sept. 16, 1981.

Decided Nov. 3, 1981.

Gerald M. Amero (orally), William J. Kayatta, Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for plaintiff.

Stephen A. Johnson (orally), for Public Utilities Commission, Augusta.

Paul A. Fritzsche (orally), Portland, for Maine Committee for Utility Rate Reform, et al.

Michael N. Westcott (orally), William C. Black, Asst. Attys. Gen., Augusta, for defendant.

Before GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

CARTER, Justice.

On June 29, 1981, Central Maine Power Company (CMP) filed with the Public Utilities Commission (PUC) a schedule of proposed rates pursuant to 35 M.R.S.A. § 64. With this filing, CMP sought to increase rates which the PUC had established on October 31, 1980, as just and reasonable under its authority conferred by 35 M.R.

---

S.A. § 69.[1] The PUC had ordered the underlying schedule of rates after investigating proposed revised rates filed by CMP under § 64 on February 1, 1980.

Invoking its suspension and investigation powers created by § 69, the PUC issued two orders in this matter delaying the operation of CMP's 1981 proposed schedule. The first order, issued on July 27, suspended the effectiveness of the proposed rates until October 29, 1981, and the second, issued on July 30, until March 29, 1982. Motions to dismiss this § 64 filing were made by the PUC staff and by the two intervenors in this case, the Attorney General and the Maine Committee for Utility Rate Reform *et al.* On August 3, 1981, the PUC granted these motions on the ground that its § 69 substi-

tute rate order of October 31, 1980, brought into effect the one year bar created by 35 M.R.S.A. § 295[2] and prevented CMP from filing proposed rates under § 64 prior to the expiration of one year from the date of that order. In so ruling, the Commission noted that the language of § 69 authorized it to issue an order affecting proposed rates "as would be proper in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation." The proceeding referred to is that authorized by 35 M.R.S.A. § 294, *New England Telephone & Telegraph Co. v. Public Utilities Commission,* Me., 376 A.2d 448, 451 (1977); *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 354 A.2d 753, 762 n.5 (1976), which empowers the PUC to

1. 35 M.R.S.A. § 69 provides in full:
   § 69. Public hearings to investigate proposed changes in rates of public utilities; suspension pending hearing
   Whenever the commission receives notice of any change or changes proposed to be made in any schedule of rates filed with said commission under the provisions of law, it shall have power at any time before the effective date of such change or changes, either upon complaint or upon its own motion and after reasonable notice, to hold a public hearing and make investigation as to the propriety of such proposed change or changes. At any such hearing involving any change or changes as above specified, the burden of proof to show that such change is reasonable shall be upon the public utility. After such hearing and investigation, the commission may make such order with reference to any new rate, joint rate, fare, rental, toll, classification, charge, rule, regulation or form of contract or agreement proposed as would be proper in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation.
   Pending such investigation and order, the commission may at any time within said period preceding the effective date of any such schedule, by filing with such schedule and delivering to the public utility affected thereby a statement of its reasons for said suspension, suspend the operation of such schedule or any part thereof, but not for a longer period than 3 months from the date of said order of suspension. If said investigation cannot be concluded within said period of 3 months, said commission may in its discretion extend the time of suspension for a further period of 5 months. Nothing in this section shall apply to any schedule filed with the commission and proposing any change or

changes in any new rate, joint rate, fare, rental, toll, classification, charge, rule, regulation or form of contract or agreement affecting the transportation of freight.
   This section shall not apply to municipal or quasi-municipal corporations which are water companies within the definition of section 15, subsection 25, and serve 400 or fewer customers, and provisions in any charter notwithstanding.

2. 35 M.R.S.A. § 295 provides in full:
   Every public utility to which such order applies shall make such changes in its schedules on file as may be necessary to make the same conform to said order. *No change thereafter shall be made by any public utility in any such rates, tolls or charges or in any joint rate or rates within one year after the date of said order without the approval of the commission.* At the expiration of one year from the date of said order, and thereafter, no change shall be made by any public utility in any such rates, tolls or charges or in any joint rate or rates except in accordance with section 64. Copies of all orders of the commission, certified by the clerk, shall be delivered to the public utility affected thereby and the same shall take effect within such time thereafter as the commission shall prescribe. The Superior Court shall have full jurisdiction upon application of the commission or of the Attorney General, to enforce all orders of the commission and the performance by public utilities of all duties imposed by law upon them, including the appointment of receivers, agents and special masters to carry the orders of said courts and of said commission into effect and clothing them with adequate authority therefor.
   (Emphasis added.)

make orders affecting *effective* rates. The Commission ruled that the § 295 one year moratorium, a consequence of a § 294 substitute rate order, similarly flows from a § 69 order. Because the issuance of a § 69 substitute rate order was thought to incorporate the § 295 bar, CMP's June 1981 filing, made within one year of the Commission's October 1980 substitute rate order, was ruled invalid.

CMP seasonably filed both an appeal from this order of dismissal under 35 M.R.S.A. § 303 and a complaint for review of the order as provided by 35 M.R.S.A. § 305. The Court ordered the two matters consolidated and subject to an expedited schedule for review pursuant to M.R.Civ.P. 76A(c).

The narrow issue presented here is whether the PUC erred in dismissing CMP's § 64 filing of June 1981 on the ground that the rates previously established under a § 69 substitute rate order brought into effect the § 295 one year bar.[3] Because we find that the Commission's dismissal of this filing was erroneous, we vacate the Commission's order as sought in CMP's § 303 appeal.

### STATUTORY FRAMEWORK [4]

A resolution of the issue presented must necessarily be undertaken within the context of the historical development of the regulatory framework as implemented by statute. A brief review of that development is appropriate.

### 1. *1913 Legislation*

Legislation enacted in 1913 established the procedural mechanisms by which utility rates were set and created the PUC itself, which was charged with administering those mechanisms. P.L. 1913, ch. 129, §§ 1, 10. Under the statute, public utilities were empowered to unilaterally set their own rates as of the date the enactment became

effective. *Id.* § 19. They were also empowered to unilaterally *change* their rates upon ten days notice to the Commission. *Id.* § 23. The Commission's power, on the other hand, was reactive: if, after a formal public hearing, the Commission found rates instituted by a utility to be "unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of the provisions of this act, the commission shall have the power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just or reasonable." P.L. 1913, ch. 129, § 44 (now, with modifications not material here, 35 M.R.S.A. § 294). This investigative machinery was triggered by a complaint made by ten people against a utility, P.L. 1913, ch. 129, § 41 (now 35 M.R.S.A. § 291), by the Commission's own motion, *id.*, § 46 (now 35 M.R.S.A. § 296), or by a complaint filed by the utility itself, *id.*, § 48 (now 35 M.R.S.A. § 298).

Once, however, the Commission substituted its own rates pursuant to *id.*, § 44 for those imposed by the utility, the utility was *forever* prohibited from changing those charges without the approval of the Commission. P.L. 1913, ch. 129, § 45. This section prevented the utility from unilaterally modifying its rates under *id.*, §§ 23–24, leaving as its only recourse the filing of a complaint against itself seeking a rate change under *id.*, § 48. Under this approach, the Commission could grant the rate change only after it had completed its investigation and issued its order under *id.*, § 44.

This Court has characterized the regulatory approach embodied in the 1913 legislation in this way:

> [a]s much as possible, the effectuation of "just and reasonable" rates was to be accomplished by the unilateral action of the utilities themselves. The policy premise was that the utilities could be

---

3. This precise issue was acknowledged and reserved for future determination in *New England Telephone & Telegraph Co. v. Public Utilities Comm'n*, Me., 354 A.2d 753, 762 n.5 (1976) (*NET* I). That opinion cannot be taken to suggest the resolution of the issue expressly reserved there.

4. A comprehensive description of the present regulatory scheme and its development is found in *NET* I, 354 A.2d at 756–64.

largely self-regulating in discharging their responsibility to establish just and reasonable rates; the regulating function of government would be to provide a spur to utility self-regulation—the spur taking the form of the Commission acting as the police officer with a club waiting in the offing to step in once a utility should transgress the "rule of reason." The legislative assumption was that the Commission would be obligated to step in with an order for a "substituted" filing of changes of rates only infrequently.

*New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 354 A.2d 753, 758–59 (1976) (*NET* I) (footnote omitted).

### 2. *1917 Legislation*

Two pertinent changes in the regulatory structure of public utilities and the mechanisms by which rates were established were made in 1917. First, the notice period preceding a unilaterally issued rate change was increased from 10 to 30 days. P.L. 1917, ch. 135 (now 35 M.R.S.A. § 64).

More importantly, the Legislature distinguished the procedures by which freight rates and non-freight rates could be changed unilaterally by a utility. P.L. 1917, ch. 44, § 1 (now 35 M.R.S.A. § 69[5]) governed the implementation of non-freight rates and permitted the Commission to suspend rates proposed by a utility pending the Commission's investigation into their just-

ness and reasonableness. The statute authorized two suspension periods of three months each,[6] the second period to be available only if the investigation could not be conducted in the initial period. Following its investigation, the Commission was empowered to make an order concerning the proposed rates under suspension "as would be proper in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation." *Id.*

It should be noted that the Commission's suspension power encompassed only those rates proposed by utilities which were not subject to the permanent bar created by P.L. 1913, ch. 129, § 45. Those utilities so barred were still obligated to file a complaint against itself to effect a rate change. Utilities not subject to the bar could implement rates unilaterally if the Commission did not issue a suspension order within the 30 day notice period. This Court has characterized the Commission's suspension power as a "preventive mechanism" because it permitted investigation into rates prior to their effectiveness and thus prevented the exposure of rate-payers to unjust and unreasonable rates which could occur pending the Commission's investigation into the legality of *effective* rates. *NET* I, 354 A.2d at 761.

As to freight rates, on the other hand, the Legislature enacted P.L. 1917, ch. 44 § 2 (now 35 M.R.S.A. § 70[7]) which provided a

---

**5.** *See* note 1 *supra.*

**6.** Under 35 M.R.S.A. § 69, *supra* at note 1, the second period is now of five months duration.

**7.** 35 M.R.S.A. § 70 provides in pertinent part:
Whenever the commission receives notice of any change or changes proposed to be made in any schedule of new rates, joint rates, fares, rentals, tolls, classifications, charges, rules, regulations or forms of contract or agreement affecting the transportation of freight, and filed with said commission under the law, said commission shall have power at any time within 30 days after the effective date of such change or changes, *either upon complaint or upon its own motion* and after reasonable notice, to hold a public hearing and make investigation as to the propriety of such proposed change or changes.

. . . .

At any such hearing involving any such change or changes, the burden of proof to show that such change is reasonable shall be upon the common carrier. After such hearing and investigation, the commission may make such order, within a period of 8 months after the effective date of the schedule, setting forth such change or changes with reference to any proposed new rate, joint rate, fare, rental, toll, classification, charge, rule, regulation or form of contract or agreement proposed as would be proper under existing law in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation. In cases involving an increase in an existing rate, joint rate, fare, rental or charge affecting the transportation of freight, if the commission shall find that such increase is unreasonable it may, by proper order, determine and fix

different method to protect rate-payers. As with pre-1917 rate changes, changes in freight rates could be effected unilaterally by the utility upon proper notice to the Commission. The Commission, however, was not vested with suspension powers which it could exercise during its investigation into the fairness of the freight rates. Instead, if the results of the Commission's investigation revealed the then-effective rates to be unjust and unreasonable, it could require the utility to refund to its customers sums collected in excess of the rates fixed as proper by the Commission. Freight rate-payers thus become entitled to *remedial* relief rather than to the *preventive* protection created by the predecessor statute to § 69. *NET* I, 354 A.2d at 760–61. Further, if the freight-carrying utility's rate increases were found unreasonable, the utility was barred by express statutory provision from filing for rates affecting those fixed as proper by the Commission within a period of one year from the entry of the Commission's order.

### 3. *1927 Legislation*

The final enactment material to this action occurred in 1927 when the Legislature reduced the duration of the bar imposed on non-freight utilities after the Commission found their rates illegal and ordered substitute rates. Under P.L. 1927, ch. 64 (now 35 M.R.S.A. § 295 [8]), the utility lost its power to unilaterally impose rates *for one year.* Once the year has passed, the utility was required to file for rate changes under 35 M.R.S.A. § 64 and its statutory predecessors. If, upon the expiration of the 30 day notice period, the Commission failed to exercise its suspension powers, the rates would become effective.

### JURISDICTION OVER § 305 COMPLAINT

The pertinent subject of a complaint for review of a Commission decision under 35 M.R.S.A. § 305 is "the constitutionality of any ruling or order of the commission...." [9] Here, CMP alleges in its complaint that the Commission dismissed CMP's § 64 filing without statutory or constitutional authority and thereby prevented the utility's proposed rates from becoming effective. This allegedly amounts to a confiscation of the utility's property rights without compensation and without due process of law.

It is clear that jurisdiction under § 305 is not created by a mere allegation that the Commission exceeded its statutory authority. *Central Maine Power v. Maine Public Utilities Commission*, Me., 395 A.2d 414, 422 (1978). Allegations, however, that the Commission's dismissal of the § 64 filing was confiscatory invoke constitutional issues. *NET* I, 354 A.2d at 767. When "the pleadings in the section 305 action present an issue as to the constitutionality of" a PUC order, this Court will entertain jurisdiction over the original action. *Central Maine Power*, 395 A.2d at 422. The essence of the purportedly constitutional claims asserted here is derived from the Commission's incorporation of the § 295 bar into its § 69 substitute rate order. CMP alleges that the Commission misconstrued the statute to permit the dismissal of its § 64 filing, thereby presumably confiscating income which would have been produced by the

the maximum rate, joint rate, toll, fare, rental or charge which may thereafter be collected for the service rendered, and no rate, joint rate, toll, fare, rental or charge affecting the transportation of freight in excess thereof shall be filed within a period of one year after the making of such order. The commission, by proper order, may require the common carrier which has filed any such increased rate, joint rate, toll, fare, rental or charge affecting the transportation of freight to refund, in such manner and under such conditions as may be prescribed by the commission, to all persons from whom charges have been collected by virtue of the schedules under investigation, any and all sums collected in excess of the rate, joint rate, toll, fare, rental, or charge affecting the transportation of freight so determined and fixed by the commission as being the maximum rate, joint rate, toll, fare, rental or charge to be collected, and may require due report of the refund so made.

**8.** *See* note 2 *supra.*

**9.** The subject of a § 303 appeal, on the other hand, is a "final decision of the commission."

rates upon their effectiveness.[10] The constitutional issues flow directly from the Commission's action alleged to be beyond its statutory powers. As counsel for CMP acknowledged at oral argument, resolution of the statutory issue will fully determine the outcome of the constitutional issues as they are presented in this complaint. Thus, because this Court's jurisdiction over the § 303 appeal here is not in doubt, we need not and do not decide whether the similar substantive issue framed in constitutional terms invokes our jurisdiction to entertain a § 305 complaint.

## INCORPORATION OF § 295 BAR INTO § 69 SUBSTITUTE RATE ORDERS

■ At the outset of this statutory analysis, we posit again "the principle of construction which, although not conclusive, accords due consideration to the interpretations of a statute by the department entrusted with its administration *in as far as they are not inconsistent with the requirement of the statute.*" *Brooks v. Smith*, Me., 356 A.2d 723, 729 (1976) (emphasis added). This is not a toothless standard. As the language itself in *Brooks* suggests, deference to the agency's construction must yield to the fundamental approach of determining the legislative intent, particularly as it is manifest in the language of the statute itself. The intent pertinent to this exegesis is that existent at the time of the statute's enactment. *Mundy v. Simmons*, Me., 424 A.2d 135, 138 (1980). This intent, once revealed, prevails. *Id.* at 137; *New England Telephone*, 376 A.2d at 453.

■ Section 69, by its express terms, does not incorporate the § 295 moratorium which prohibits utilities from changing rates within one year of the date on which those rates are fixed and ordered by the PUC pursuant to § 294. Consequently, reference must be made to the larger statutory scheme, which includes § 69, in order to determine the legislative intent underlying the 1917 enactment of the predecessor to § 69.

The public utilities laws in Maine are designed "to assure, to the greatest extent possible, that effective rates shall be just and reasonable rates." *New England Telephone*, 376 A.2d at 454; 35 M.R.S.A. § 51. Prior to the 1917 legislation, a public utility was permitted to establish rates without regulatory constraints until its rates were determined to be unjust and unreasonable. Upon such a determination, the utility was no longer considered capable of self-regulation in establishing its rates. *NET* I, 354 A.2d at 758–59, *quoted supra* at 882–883. The subsequent imposition of the bar, which was then permanent, required the utility to resort to the Commission's machinery and to seek its approval before the rates, previously established as reasonable, could be modified. In this way, the utility was no longer free to impose rates without prior administrative review, and the reasonableness and justness of effective rates were assured.

The enactment of P.L. 1917, ch. 44, § 1 (now § 69) provided a distinctive methodology by which the PUC could maintain just and reasonable utility rates. As we have noted *supra* at 883–884, this legislation enabled the Commission to suspend proposed rates and determine their legality before effectiveness. Meanwhile, rates which had been subject to Commission scrutiny would continue to be effective, and the bar was thereby unnecessary to protect rate-payers. This suspension power guarantees that the Commission ensures the reasonableness of rates *before* effectiveness, and consumers would thus be protected even if that utility was found to have proposed unlawful rates. There is thus no reason to read into the "such order . . . as would be proper in a proceeding initiated

---

**10.** The effectiveness of CMP's proposed rates was suspended before its 1981 § 64 filing was dismissed. Yet, there exists the possibility that the Commission, in the absence of its order of dismissal, would have lifted the suspension, allowing the proposed rates to become effective, or issued a § 69 substitute rate order, allowing some increase in CMP's previously effective rates, before this action was instituted. We therefore cannot say on the record before us that CMP would not have been entitled to higher rates if the Commission had not dismissed its 1981 filing. Thus, the Commission's two orders of suspension would not themselves defeat the constitutional dimensions of this action, if such dimensions exist.

upon complaint" language in the 1917 legislation an intent *at the time of that enactment* that the permanent moratorium against subsequent unilateral changes effected by the utility follow from a § 69 substitute rate order.

In its order dismissing CMP's § 69 filing, the PUC characterized the bar as imposing a "period of repose between unilateral changes" made by the utility. When the moratorium follows a determination that effective rates are unlawful, the Commission's substitute rates prevail for one year over those filed by the utility and found to be unreasonable. The need for such a period, the PUC now argues, is not diminished by the fact that the Commission's suspension powers prevent the rates, it finds to be illegal, from becoming effective.

Also, the delay between § 64 filings would, in the PUC's view, prevent administrative "pancaking"—the burdensome accumulation of pending rate reform filings. Whether or not the rates preceding the order were legal, argues the Commission, a period of stability was intended to follow a Commission determination of reasonableness and justness.

The Commission relies on *Trustees of Saratoga Springs v. Saratoga Gas, Electric Light & Power Co.*, 191 N.Y. 123, 83 N.E. 693 (1908), for the notion that the legislature may impose a period of repose during which time scrutinized and sanctioned rates would prevail. In the case at bar, however, we must determine whether the 1917 Legislature *did in fact intend* that the moratorium follow a § 69 substitute rate order, and not whether the Legislature *would have been justified* in establishing such a period. *Saratoga Gas*, based on a different statute, is inapposite to the point at issue here.

*Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), is similarly distinguishable.

More importantly, the bar in *Saratoga Gas* was of three years duration; that examined in *Permian Basin* was also of a limited nature. Here, § 69 must be understood in the light of the intent which gave rise to the enactment of its predecessor in 1917. *Mundy*, 424 A.2d at 138. At that time, the bar was permanent, and it forever barred rate changes effected unilaterally by utilities subject to it. Thus, in distinction to the statutory schemes examined in *Saratoga Gas* and *Permian Basin* the bar, in 1917, could not have been characterized as a device by which rates established as reasonable both prevailed for a limited time and relieved the agency from further scrutiny of the rates during the bar's operation. The PUC's approach is misguided as an attempt to derive meaning from the events of 1917 in reliance upon facts which only came into existence many years later. Application of the bar *as it existed in 1917* to § 69 orders would not have furthered the purposes underlying the statute governing the determination of utility rates, and we find no basis in later legislation for attributing to the Legislature any intention to change the statute's original meaning.

A comparison between §§ 69 [11] and 70,[12] their predecessors being enacted simultaneously in P.L. 1917, ch. 44,[13] further demonstrates that the Legislature did not intend to prevent the unilateral modification of those rates set in a § 69 substitute rate order.[14] Accompanying the remedial structure embodied in § 70, by which the Commission could order the offending freight utility to refund to its customers charges which exceed a lawful rate established by

11.  *See* note 1 *supra.*

12.  *See* note 7 *supra.*

13.  *See* text *supra* at 883–884.

14.  The Commission's order of dismissal rejected this comparative approach as unhelpful because the subjects of the two provisions differ. Yet, we have employed this method of analysis in *S.D. Warren Co. v. Maine Central Railroad,* 126 Me. 23, 135 A. 526 (1926) which compared

the differences between §§ 69 and 70 to determine the timeliness of a complaint challenging freight rates. Further, such a comparison is entirely appropriate because its goal is to construe language common to both sections; an understanding of this language may be gleaned by comparing the functions of both sections in the larger statutory scheme. *In re Belgrade Shores, Inc.,* Me., 359 A.2d 59, 61 (1976).

the Commission, the Legislature expressly included a moratorium. It provides that, in cases involving an increase in an existing freight rate, a substitute rate order issued by the Commission prohibits the affected utility from filing further rates "within a period of one year after the making of such order."

Section 69, on the other hand, includes no such language creating the bar by its own terms. The two statutes became law simultaneously and in the same legislative enactment. Further, they both function to identify the procedure by which the PUC can examine utility rates and, if appropriate, issue a substitute rate order. Under these circumstances, significance may be attached to the absence of the bar in § 69 in light of its inclusion in § 70. *See Maine Turnpike Authority v. Brennan*, Me., 342 A.2d 719, 728 (1975); *Martin v. Piscataquis Savings Bank*, Me., 325 A.2d 49, 51 (1974). We therefore hold that the 1917 Legislature's failure to include the moratorium in the predecessor to § 69 evinces its intent that a substitute rate order issued under that section does not invoke the bar.

In addition, the § 70 order invoking this sanction is one which "would be proper under existing law in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation." The nature of a § 69 substitute rate order, affecting proposed non-freight rates, is described in language nearly identical to this: "such order . . . as would be proper in a proceeding initiated upon complaint or upon motion of the commission in any rate investigation." If this quoted language refers to the § 295 bar, then, at the time of the enactment of P.L. 1917, ch. 44, freight utilities whose rate increases were found unreasonable would have been subject both to a one year bar under that statute and to the then-permanent bar established in P.L. 1913, ch. 129, § 45. We will not attribute to the legislature an intent to create this anomalous and inconsistent result.[15] *See*

*Schwanda v. Bonney*, Me., 418 A.2d 163, 166 (1980); *Bernard v. Cives Corp.*, Me., 395 A.2d 1141, 1148–49 (1978). Because the "such order" language in § 70 does not thereby incorporate the moratorium found in § 295, the virtually identical "such order" language in § 69, likewise should not be read to contemplate the incorporation of the § 295 bar.

Finally, we note that § 294, which empowers the Commission to issue an order affecting effective rates and which is the referent of the "such order" language of § 69, does not function independently of § 295. The latter requires the utility to adopt the Commission's order issued under § 294; it requires that copies of the Commission's substitute rate order be delivered to the utility; and it creates jurisdiction in the Superior Court to enforce the Commission's order. In dictum, this Court has stated that § 69 incorporates, by the "such order" language, the enforcement structure of § 294 which is established in § 295. *NET I*, 354 A.2d at 762 n.5. Here, we are presented only with the question, which we answer in the negative, of whether the specific provision in § 295 creating the one year bar against the § 64 filings is a mechanism incorporated into § 69. We need not and do not reach deeper into the statutory scheme to identify other terms of § 295 which may or may not be activated by § 69 substitute rate orders.

The entry is:

In the § 303 appeal, the Order of Dismissal issued by the Commission is vacated.

The § 305 complaint is dismissed as mooted by our decision on the § 303 appeal.

The case is remanded to the Commission for appropriate action consistent with the opinion herein.

All concurring.

---

15. Because the intent of the 1917 Legislature is at issue here, *see Mundy*, 424 A.2d at 138, the subsequent reduction of the duration of the bar to one year, thereby making its effect consist-

ent with that of the bar originally imposed on freight carriers, is not relevant to a determination of the Legislature's intent at the time of the 1917 enactment.