CENTRAL MAINE POWER COMPANY

v.

PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued Sept. 9, 1982.

Decided April 12, 1983.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Gerald M. Amero (orally), Peter H. Jacobs, Portland, for plaintiff.

Joseph C. Donahue, Charles F. Dingman (orally), Augusta, for defendant.

Before GODFREY, NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

NICHOLS, Justice.

Here we are called upon to interpret the provision the Legislature has made for fuel cost adjustment in electric utility rates. Consolidated in the proceeding before us are an appeal under 35 M.R.S.A. § 303 and a complaint pursuant to 35 M.R.S.A. § 305, both brought by Central Maine Power Company to obtain review of a December 24, 1981, decision and order of the Public Utilities Commission, as supplemented by that agency.

That portion of the December 24 order at issue here involves the general concept of fuel cost adjustment, the mechanism by which costs and savings associated with fuel used to generate electricity are passed on to a utility's customers, and requires an interpretation of the pertinent statute, 35 M.R.S.A. § 131.[1] The Commission, in its Decem-

---

1. 35 M.R.S.A. § 131 (Supp.1982–83) provides:
   1. *Definition.* For the purposes of this section, the words "electric utility" shall mean any electrical company, as defined in section 15, subsection 5, with total assets in excess of $40,000,000.
   2. *Fuel cost.* Subject to the approval of the commission each electric utility shall include as part of its base rates a reasonable cost for fuel to provide its customers with electricity. The cost of fuel shall include fuel consumed in the electric utility's generating stations and the cost of power purchased by the electric utility for use in Maine, pursuant to regulations promulgated by the commission un-

der this section and in accordance with the requirements of subsection 4. The amount to be included in a utility's base rates shall be determined at the time of general rate adjustment under section 64 or 296 and shall be based upon the utility's reasonable costs of fuel during the test year used for the rate adjustment.
   3. *Fuel cost adjustment.* Notwithstanding the requirements of section 69, an electric utility shall adjust its electricity charges to customers to recover increases and to credit for decreases in the cost of fuel used in the generating and supplying of electricity subsequent to a general rate proceeding under sec-

ber 24 order, specifically required the Company to include in its fuel adjustment calculations "savings shares" the Company receives from sales of surplus electricity to the New England Power Exchange.

The Company challenges such inclusion of sales-related savings shares in the fuel cost adjustment calculations, asserting that (1) it is inconsistent with the pertinent statute; (2) it involves retroactive ratemaking and, further, is arbitrary, capricious and confiscatory; and (3) it violates the Maine Administrative Procedure Act, 5 M.R.S.A. § 8001, *et seq.* Because we conclude that the Commission's mandated inclusion of sales-related savings shares in the Company's fuel adjustment calculations is contrary to the legislative intention expressed in the governing statute, we do not reach the latter two issues.

The Company belongs to the New England Power Pool which operates the New England Power Exchange, the latter a centralized system through which utilities all

tion 64 or 296, subject to the conditions of this section.

4. *Scope of adjustment.* Changes in the cost of fuel consumed in the electric utility's generating stations and changes in the cost of power purchased by the electric utility for use in Maine shall constitute the only items subject to adjustment, pursuant to regulations promulgated by the commission under this section. Those changes in the cost of purchased power which are subject to that adjustment shall exclude all capacity charges, except that to the extent the commission deems just and reasonable, capacity charges for power purchased from small power producers or cogenerators, as defined in section 2323, may be included in the adjustment. Credits received by the utility for fuel or the fuel component of either purchased power or power sold to other utilities, including credits associated with purchased energy received from the savings fund of the New England Power Exchange, shall be considered changes in the cost of fuel for the purposes of the fuel cost adjustment, pursuant to regulations promulgated by the commission under this section.

5. *Fuel adjustment rate applied uniformly to customers.* The fuel cost adjustment established under this section shall be billed or credited at a single uniform rate per kilowatt hour for all customers of the electric utility.

6. *Calculation and billing of fuel adjustment.* Within 120 days following the effective date of this section, the commission shall establish rules and regulations for the calculation and billing of fuel cost adjustments. The rules and regulations shall include, but shall not be limited to:

A. The fuel accounting method to be used to determine cost of fuel;

B. The fuel computation period and method of computation of fuel adjustment rate;

C. Definitions and components of fuel costs to be included in the fuel cost adjustment;

D. An appropriate method to amortize a utility's unrecovered reasonable fuel costs;

E. An appropriate method to credit customers for fuel cost overcharges; and

F. Reporting requirements to administer this section.

The commission may, in its discretion, establish a fuel adjustment rate for a fuel computation period based on projected kilowatt hour sales and fuel costs for that period, and make appropriate adjustments for overcharges or undercharges in customer bills in subsequent computation periods to account for the difference between the projected kilowatt-hour sales and fuel costs and actual kilowatt-hour sales and reasonable fuel costs.

7. *Commission approval required.* In no event shall a fuel adjustment charge be billed to customers which has not been approved and ordered into effect by the commission pursuant to this section. Each electric utility shall file application for changes in its fuel adjustment rate in accordance with regulations promulgated pursuant to this section. The commission shall order notice of the application to be published within 7 days of receipt of the application and shall set a time and place for a public hearing which shall be held, unless otherwise ordered by the commission, within 14 days after publication of the notice. The commission shall render its decision on the application within 45 days of the close of the hearing, or within 45 days of receipt of the application, if no hearing is held. No electric utility shall make application for changes in its fuel adjustment rate until a period of 90 days has elapsed from the filing of its last application, unless otherwise ordered by the commission.

8. *Reports.* The commission may require electric utilities to provide such reports and information as it deems necessary to administer this section.

9. *Other electric utilities.* The commission shall promulgate reasonable rules and regulations governing the fuel adjustment clause of electric utilities with total assets less than $40,000,000. These rules and regulations shall be consistent with the purposes of this subchapter.

over New England share surplus power. Participating utilities can sell surplus electricity to the Exchange; likewise, should they run short, or if another utility can produce electricity more economically, power can be purchased from the Exchange.

The cost efficiencies of this system are passed on to participating utilities in the form of savings shares. Each time a member utility either purchases or sells electricity through the Exchange, savings shares—which are worth approximately $4.00 apiece—accrue, at a rate of one savings share per kilowatt-hour. These shares, all of equal value, are classified as either purchase-related savings shares or sales-related savings shares, depending on the method in which they are earned by the participating utility.

In 1978, the Maine Legislature enacted 35 M.R.S.A. § 131, which governs fuel adjustment for utilities. The 1978 statute cited above generally defines the concept and scope of fuel cost adjustment, but of particular importance in this proceeding is one sentence in subsection (4):

> Credits received by the utility for fuel or the fuel component of either purchased power or power sold to other utilities, including credits associated with purchased energy received from the savings fund of the New England Power Exchange, shall be considered changes in the cost of fuel for the purposes of the fuel cost adjustment, pursuant to regulations promulgated by the commission under this section.

35 M.R.S.A. § 131(4) (Supp.1982–83).

The pivotal inquiry is whether this sentence contemplates the inclusion within the fuel cost adjustment of purchase-related savings shares, only, or of both purchase-related and sales-related shares. No relevant legislative history being available to us, we are left with only the statutory language of the section as we seek to determine whether the Legislature purposefully omitted any reference to sales-related shares, as contended by the Company, or whether, as argued by the Commission, the inclusion of purchase-related shares was only by way of example.

The Commission's interpretation of this statute is reflected in the regulations it adopted in 1979. Those regulations, now entitled Chapter 34, define the cost of fuel attributable to purchased power as "net of discounts and/or savings shares attributable to energy sales or purchases." 65–407 C.M.R. 34.1(E) (1979). Under these regulations, then, sales-related savings shares enter into the fuel adjustment calculations.

The Commission stresses the presumptive validity of Chapter 34, arguing that this constitutes a properly delegated "legislative" rule which must be accorded much greater judicial deference than an "interpretative" rule. We do not find this distinction compelling as it relates to the case before us.

However Chapter 34 may be characterized, the regulation cannot stand if it is not in accord with the underlying statute. "[I]nsofar as rules promulgated by subordinate authority tend to contravene the provisions of controlling law, ... such rules and regulations are of no effect and will 'be promptly declared invalid.'" *Joyce v. Webber,* 157 Me. 234, 238, 170 A.2d 705, 708 (1961) (quoting *McKenney v. Farnsworth,* 121 Me. 450, 452, 118 A. 237, 238 (1922)).

■ . Likewise, although deference is due the interpretation of a statute by the agency charged with its administration, such deference "must yield to the fundamental approach of determining the legislative intent, particularly as it is manifest in the language of the statute itself.... This intent, once revealed, prevails." *Central Maine Power Co. v. Maine Public Utilities Commission,* Me., 436 A.2d 880, 885 (1981).

■ The legislative intention with respect to sales-related savings shares cannot be divined from the pertinent statute with anything approaching crystalline certainty. The language is ambiguous. A close reading of the section as a whole, however, convinces us that the Legislature did not intend to include sales-related shares within the scope of the fuel cost adjustment.

We reach this conclusion with specific reference to the statement in subsection (2), that:

> [E]ach electric utility shall include as part of its base rates a reasonable cost for fuel to provide its customers with electricity. The cost of fuel shall include fuel consumed in the electric utility's generating stations and the cost of power purchased by the electric utility for use in Maine, pursuant to regulations promulgated by the commission under this section and in accordance with the requirements of subsection 4.

35 M.R.S.A. § 131(2) (Supp.1982–83). Subsection (2) attempts to structure the fuel cost adjustment so as to reflect the costs for fuel incurred in providing Maine customers with electricity. The subsection allows recovery for the cost of fuel consumed in a utility's own generating for consumption in Maine along with the fuel component of the cost of power purchased for use in Maine. The thrust is to charge Maine customers with the cost of fuel used in producing power for them.

The inclusion in subsection (4) of *purchase*-related savings shares in the fuel cost adjustment is entirely consistent with that end. Sales-related shares, however, are different. These savings shares accrue when an electric utility sells electricity to the Exchange. By definition that electricity is not being produced for use by the consumers in Maine; consequently, the Legislature has not required passing on any sales-related savings shares accrued, in the form of the fuel cost adjustment for Maine customers.

The Exchange, as we observed earlier, is comprised of electric utilities throughout New England. Adjusting the fuel cost calculations, for example, to reflect savings the Company earns by selling surplus electricity to a utility in Connecticut would contradict the emphasis in subsection (2) on "use in Maine."

It is true, as the Commission argues, that subsection (4) does include within the "cost of fuel" credits received by a utility for fuel or the fuel component of power sold to other electric utilities. However, it appears that all sales other than to the Exchange are to consumers in Maine. In the absence of a clearer legislative declaration we are unwilling to construe that language as comprehending the sales-related savings shares a utility receives for dealing with the Exchange.

The entry is:

In the § 303 appeal, the supplemented Decision and Order of the Commission is vacated.

The § 305 complaint is dismissed as mooted by our decision on the § 303 appeal.

The case is remanded to the Commission for appropriate action consistent with the opinion herein.

ROBERTS and CARTER, JJ., concurring.

VIOLETTE, Justice, with whom GODFREY, J., joins, dissenting.

This case involves the statutory interpretation of the scope of the fuel cost adjustment set forth in 35 M.R.S.A. § 131(4). The key issue in this case centers on the meaning of the following sentence contained in subsection (4):

> Credits received by the utility for fuel or the fuel component of either purchased power or power sold to other utilities, including credits associated with purchased energy received from the savings fund of the New England Power Exchange, shall be considered changes in the cost of fuel for purposes of the fuel cost adjustment, pursuant to regulations promulgated by the commission under this section.

We must determine whether this sentence includes within the scope of the fuel cost adjustment New England Power Exchange (NEPEX) savings shares associated with both purchases and sales or only those associated with purchases. I must respectfully dissent from the majority's holding that the inclusion of NEPEX sales-related savings shares contravenes the legislative intent of section 131.

I begin my analysis by looking to the express language of the sentence in question. *Concord General Mutual Insurance Co. v. Patrons-Oxford Mutual Insurance Co.,* 411 A.2d 1017, 1020 (Me.1980) (where the words of a statute are clear and unambiguous, they should be strictly construed); *Ballard v. Edgar,* 268 A.2d 884, 885 (Me. 1970). The plain language of section 131(4) broadly states that "[c]redits received by the utility for fuel or the fuel component of . . . power sold to other utilities" shall be included in the fuel cost adjustment. Because sales handled through NEPEX are sales to other utilities, the credits associated with these sales clearly come within the express language of the statute. CMP does not question the proposition that sales handled by NEPEX are sales to other utilities; rather, CMP argues that this sentence does not contemplate sales-related savings shares because the express reference to purchase-related savings shares immediately following the phrase quoted above is meant to be exclusive and, therefore, we must read the statute to reflect a legislative intent not to include NEPEX sales-related savings shares. I disagree. The statute proceeds from the general premise that credits received for the fuel or fuel component of purchased energy or the sale of energy to other utilities are to be included in the scope of the fuel cost adjustment. The statute then specifically states that these credits include NEPEX purchase-related savings shares. In light of the structure of this sentence, the only logical reading is that the reference to NEPEX purchase-related savings shares is illustrative and not meant to be exclusive.

If the legislature intended to exclude the sales-related shares by specifically referring only to the NEPEX purchase-related shares, the sentence would have been drafted differently. For example, CMP's argument would be more persuasive if the sentence read as follows:

> Credits received by the utility for fuel or the fuel component of either purchased power, *including credits associated with purchased energy from the savings fund of the New England Power Exchange,* or power sold to other utilities shall be considered charges in the cost of fuel for purposes of the fuel cost adjustment.

The Legislature also could have expressed that intent by using an "or" before the phrase specifically referring to the credits associated with purchases of energy from NEPEX rather than the term "including". Of course, it could have best expressed that intent by specifically excepting NEPEX sales-related savings shares. Yet, it did none of these things. Because of the structure of the sentence as it was actually drafted, I must conclude that the legislature intended to include within the scope of the fuel cost adjustment credits associated with sales of energy handled through NEPEX.

On its face, the statute does not distinguish between wholesale sales of power to Maine utilities for use in Maine and sales of power to utilities handled through the NEPEX system. The majority's holding, however, is premised on its perception that section 131(2)[1] narrowly structures the scope of the fuel cost adjustment, as expressed in subsection (4), to reflect changes only in the cost of fuel used to provide Maine customers with electricity. According to the majority, NEPEX purchase-related savings shares are consistent with that purpose, while NEPEX sales-related savings shares are inconsistent because that electricity is not being produced for use by the consumers in Maine. The following sentence sums up the majority's reasoning: "Adjusting the fuel cost calculations, for example, to reflect savings the company earns by selling

---

1. The majority specifically points to the following passage in subsection (2):

> [E]ach electric utility shall include as part of its base rates a reasonable cost for fuel to provide its customers with electricity. The cost of fuel shall include fuel consumed in the electric utility's generating stations and the cost of power purchased by the electric utility for use in Maine, pursuant to regulations promulgated by the commission under this section and in accordance with the requirements of subsection 4.

surplus electricity to a utility in Connecticut would contradict the emphasis in subsection (2) on 'use in Maine'."[2] Therefore, the majority refrained from construing the sentence in question as comprehending sales-related savings shares received by CMP for dealing through NEPEX.

First, I disagree with the majority's premise that subsection (2) sets forth the framework of a statutory scheme that requires us to so narrowly construe the phrase "credits received . . . for . . . power sold to other utilities."[3] Subsection (2) makes clear that a utility can include as part of its base rates a reasonable cost of fuel to provide its customers with electricity. Subsection (2) contains no language to indicate that its purpose is to structure the scope of the fuel clause adjustment. However, the first sentence in subsection (4) regarding just what items shall be subject to adjustment parallels the sentence in subsection (2) which addresses just what "the cost of fuel" shall include for purposes of a base rate proceeding.[4] This parallel structure supports the majority's position and, if subsection (4) included only this one sentence, then I would tend to agree with the majority that subsection (2) structures the scope of the fuel clause adjustment as provided by subsection (4).

Significantly, subsection (4) goes on to expressly require the inclusion of credits received by a utility for fuel or the fuel component of purchased energy or energy sold to other utilities in the scope of the fuel cost adjustment. The subsection expressly provides that these credits "*shall* be considered changes in the cost of fuel for purposes of the fuel cost adjustment." (emphasis added). Therefore, the statute specifically includes the category of "credits" in the scope of the fuel cost adjustment notwithstanding that the credits may not properly be included among the items subject to adjustment as provided by the first sentence of subsection (4). Subsection (2) simply contains no language expressly bearing on how we should construe the sentence involving credits. Furthermore, this additional sentence in subsection (4) undercuts any inference which can be drawn from the parallel structure noted above that the Legislature intended subsection (2) to structure the scope of subsection (4).

Reading section 131 as a whole, I must conclude that subsection (2) does not control the scope of the fuel cost adjustment set forth in subsection (4), but rather its purpose is to broadly set forth why the utility's customers shall be affected by the fuel adjustment clause. In subsection (4), the Leg-

2. The majority opinion ignores the fact that other Maine generating utilities such as Bangor Hydro Electric Company transact business through NEPEX. Therefore, NEPEX sales by CMP may not necessarily go out of state and some unknown amount of savings shares may be associated with sales to utilities for use in Maine. According to the majority's reasoning, the statute would contemplate the inclusion of NEPEX sales-related savings shares associated with sales by CMP to utilities such as Bangor Hydro because that power would be used in Maine. I simply do not agree that the statutory scheme treats NEPEX sales-related savings shares differently depending upon whether they are associated with sales to Maine generating utilities or sales to out of state utilities. Furthermore, the record just does not reveal how CMP would account for NEPEX sales to Maine generating utilities or whether it could be done at all.

3. The record failed to reveal the existence of credits other than NEPEX savings shares. At oral argument, the PUC claimed that NEPEX savings shares were the only credits of which it was aware. Assuming that NEPEX savings shares are the only credits now in existence, then the majority's opinion has the effect of rendering meaningless the phrase "[c]redits received by the utility for fuel or the fuel component of . . . power sold to other utilities . . . shall be considered changes in the cost of fuel for purposes of the fuel cost adjustment . . . ."

4. Subsection (2) provides that "[t]he cost of fuel shall include fuel consumed in the electric utility's generating stations and the cost of power purchased by the electric utility for use in Maine." The first sentence in subsection (4) provides that "[c]hanges in the cost of fuel consumed in the electric utility's generating stations and changes in the cost of power purchased by the electric utility for use in Maine shall constitute the only items subject to adjustment."

islature has separately detailed in the sentence in question just how credits fit into the scheme of the fuel cost adjustment and, therefore, the plain language of this sentence must control. As discussed previously, I conclude that the plain language of the sentence in question clearly contemplates the inclusion of NEPEX sales-related savings shares in the scope of the fuel cost adjustment.

I also perceive the purpose of subsection (4) as being broader than that assigned to it by the majority. By expressly including the category of credits in the fuel cost adjustment as it has, the Legislature has expressed its desire to structure the scope of the fuel cost adjustment as being broad enough to include credits that reduce the overall cost of fuel thereby benefiting the Maine rate payer, even though these credits may accrue from sales of power to out of state utilities. Therefore, the thrust of the fuel clause adjustment is not meant to distinguish whether the credits arise from in state or out of state sales to other utilities, but rather it is meant to include credits or costs which operate to reduce or increase the overall cost of fuel for the Maine customer.

My conclusion that the sentence in question clearly contemplates the inclusion of NEPEX sales-related savings shares is entirely consistent with the underlying purposes of the fuel clause adjustment as I see it. NEPEX is part of the New England Power Pool (NEPOOL) system. NEPOOL is an organization made up of utilities located throughout New England. NEPEX represents a centralized system for sharing power on a basis maximizing the efficiency of New England's generating facilities. To reflect each utility's proportionate share of the benefits of pooled power plant dispatching, each NEPOOL utility receives a "savings share" for both energy sold or purchased through NEPEX. Contrary to the artificial distinction created by the majority, NEPEX does not distinguish between purchase and sales-related shares either on the basis of value or terminology. Each

share represents a savings and each share is equal in value. Because NEPEX sales-related savings shares reduce the overall costs of fuel in just the same manner as the purchase-related savings shares, I see them both as consistently fitting into the statutory scheme. For this reason, inclusion of NEPEX sales-related savings shares is consistent with the underlying purposes of the scope of the fuel cost adjustment (to adjust the cost of fuel to provide Maine customers with energy), and I would, therefore, construe the express language of section 131(4) as including credits associated with sales handled through NEPEX. On this issue I would affirm the decision of the PUC.