## MAINE PUBLIC ADVOCATE

v.

## PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued March 16, 1984.

Decided May 1, 1984.

Paul A. Fitzsche, Esq., Stephen A. Johnson, Maine Public Advocate (orally), Augusta, for plaintiff.

Cushing Pagon Samp (orally), Joseph G. Donahue, Augusta, for Public Utilities Commission.

Gerald Amero (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for Central Maine Power Co.

Before NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ., and DUFRESNE, A.R.J.

GLASSMAN, Justice.

The Public Advocate, as authorized by 35 M.R.S.A. § 1–A(4)(J) (Pamph.1983–1984),[1]

---

1. 35 M.R.S.A. § 1–A(4)(J) provides:

4. *Duties.* The duties and responsibilities of the Public Advocate shall be to represent the using and consuming public in matters within the jurisdiction of the commission, including, but not limited to:

....

J. When deemed necessary by the Public Advocate, in the interest of the using and consuming public, or any particular group thereof, intervening and appearing on their behalf in any proceedings before the commission, appeals from orders of the commission, or proceedings before state and federal agencies and courts in which the subject matter of the action affects the customers of any utility doing business in this State, except that the Public Advocate shall not intervene in any proceeding in which the commission staff is representing a position substantially similar to that of the Public Advocate, as determined by the Public Advocate.

brings this appeal from a decision of the Public Utilities Commission (PUC) entered October 21, 1983. That decision purported to implement a remand order rendered by this court on April 12, 1983, in *Central Maine Power Company v. Public Utilities Commission*, 458 A.2d 739 (Me.1983). On this appeal, brought pursuant to 35 M.R.S.A. § 303 (1978), the Public Advocate argues the PUC's subsequent decision on remand incorrectly interpreted both the decision of this court and the provisions of 35 M.R.S.A. § 131, the fuel cost adjustment statute.[2] Because we find the PUC committed no error of law, we affirm the decision of the Commission.

## I.

Ordinarily, in rate adjustment proceedings initiated by a utility under 35 M.R.S.A. §§ 64 and 296, the PUC approves schedules for prospective rate increases. Title 35 M.R.S.A. § 51 (1978) authorizes the Commission to approve rates which are "just and reasonable," and to "provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms." As we explained in *Central Maine Power Company v. Public Utilities Commission*, 455 A.2d 34 (Me.1983), the "just and reasonable" rate is determined by the PUC after consideration of the utility's appropriate rate of return, "designed to provide sufficient revenue to cover the Company's total cost of service. Such costs include both the operating expenses of the utility and an adequate 'return' on the investment in property and equipment serving the public." *Id.* at 38, citing *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 448 A.2d 272, 284 (Me.1982). One of the many items included in an electric utility's "operating expenses" is a reasonable estimate for cost of fuel,[3] including fuel consumed in the

---

2. At the time we decided *Central Maine Power Co. v. Public Utilities Commission*, 458 A.2d 739 (Me.1983), section 131 provided, in pertinent part:

> 2. *Fuel cost.* Subject to the approval of the commission each electric utility shall include as part of its base rates a reasonable cost for fuel to provide its customers with electricity. The cost of fuel shall include fuel consumed in the electric utility's generating stations and the cost of power purchased by the electric utility for use in Maine, pursuant to regulations promulgated by the commission under this section and in accordance with the requirements of subsection 4. The amount to be included in a utility's base rates shall be determined at the time of general rate adjustment under section 64 or 296 and shall be based upon the utility's reasonable costs of fuel during the test year used for the rate adjustment.
> 3. *Fuel cost adjustment.* Notwithstanding the requirements of section 69, an electric utility shall adjust its electricity charges to customers to recover increases and to credit for decreases in the cost of fuel used in the generating and supplying of electricity subsequent to a general rate proceeding under section 64 or 296, subject to the conditions of this section.
> 4. *Scope of adjustment.* Changes in the cost of fuel consumed in the electric utility's generating stations and changes in the cost of power purchased by the electric utility for use in

Maine shall constitute the only items subject to adjustment, pursuant to regulations promulgated by the commission under this section. Those changes in the cost of purchased power which are subject to that adjustment shall exclude all capacity charges, except that to the extent the commission deems just and reasonable, capacity charges for power purchased from small power producers or cogenerators, as defined in section 2323, may be included in the adjustment. Credits received by the utility for fuel or the fuel component of either purchased power or power sold to other utilities, including credits associated with purchased energy received from the savings fund of the New England Power Exchange, shall be considered changes in the cost of fuel for the purposes of the fuel cost adjustment, pursuant to regulations promulgated by the commission under this section.

3. The computations made in the course of a base rate proceeding—ascertaining the utility's available base revenues and establishing a base rate schedule—involve consideration of a myriad of factors, some of which this court has had previous occasion to consider. *See, e.g., Central Maine Power Company v. Public Utilities Commission*, 455 A.2d 34 (Me.1983) (consideration of utility's cost of equity, allowance for attrition, working capital requirements for ratemaking purposes); *Camden & Rockland Water Company v. Maine Public Utilities Commission*, 432 A.2d 1284 (Me.1981) (consideration of utility's

electric utility's generating stations and the cost of power purchased by the electric utility for use in Maine. 35 M.R.S.A. § 131(2). The estimated cost of fuel to be included as an operating expense is "based upon the utility's reasonable costs of fuel during the test year used for the rate adjustment." *Id.* After consideration of all relevant factors, the base rate at which customers will be charged is fixed by the PUC.

The PUC is also authorized by section 131(3) to approve fuel cost adjustments: "[A]n electric utility shall adjust its electricity charges to customers to recover increases and to credit for decreases in the cost of fuel used in the generating and supplying of electricity subsequent to a general rate proceeding." Section 131(4) specifically defines the scope of the adjustment: "Changes in the cost of fuel consumed in the electric utility's generating stations and changes in the cost of power purchased by the electric utility for use in Maine shall constitute the only items subject to adjustment." As we have previously observed, the Commission's authority to make adjustments in subsequent computation periods for overcharges or undercharges in customers' bills, "is confined to the special situation addressed by the provisions of the statute as part of the legislative effort to resolve one of the problems created by rapidly fluctuating fuel costs." *First Hartford Corporation v. Central Maine Power Company,* 425 A.2d 174, 180 (Me.1981). The fuel adjustment clause of section 131 is therefore an express, limited exception to the general prohibition against retroactive ratemaking.

tax expenses); *Central Maine Power Company v. Public Utilities Commission,* 405 A.2d 153 (Me. 1979); *New England Telephone & Telegraph Company v. Public Utilities Commission,* 390 A.2d 8 (Me.1978) (consideration of utility's cost of debt, cost of equity, capital structure appropriate in establishing base rates).

4. The PUC's decision on remand described how the savings fund operates:
A savings share is earned for each megawatt hour (MWH) bought or sold from a NEPEX

## II.

Central Maine Power Company (CMP) participates in the New England Power Exchange (NEPEX), a centralized system through which participating utilities throughout New England buy and sell surplus electricity to one another. Purchases and sales made through NEPEX are paid for in the ordinary course, and, in addition, each time a utility participates in any such transaction, the utility receives a "savings share" for each megawatt-hour traded.[4] Utilities receive both purchase-related savings shares and sales-related savings shares, depending on the method in which they are earned.

Prior to December 24, 1981, the PUC included the sales-related savings shares earned by the utility through NEPEX at a level reflected in the last rate case test year as a component of the utility's available base revenues. The purchase-related savings shares, on the other hand, were considered part of the "cost of fuel," to be accounted for in the periodic fuel adjustment, as expressly required by section 131(4). On December 24, 1981, the PUC, by its order in *Re: Central Maine Power Company,* a fuel adjustment proceeding initiated pursuant to section 131 [hereinafter referred to as Docket No. 81–191], announced a change in its prior practice. The Commission decided the sales-related savings shares, along with the purchase-related savings shares, would thenceforth be factored into the fuel adjustment computations under section 131(4). The effect of this change would be a lower fuel cost adjustment charge for consumers. In

member. Thus, any such transaction will produce two savings shares per MWH. The difference (savings) between the cost to the buying utility of purchasing the MWH instead of generating it within its own system goes into the savings fund. Periodically, the fund is divided by the number of shares to produce a value per savings share, which is distributed to the [utility] shareholders. CMP's shares from its sales (not from its purchases) are what are at issue in this case.

Docket No. 81–191 the PUC also announced that the next time it made a base rate calculation, the sales-related savings shares would not be factored in as base revenue available to the Company.

The PUC implemented this change in base revenue calculations in a CMP base rate case it decided on March 27, 1982, *Re: Central Maine Power Company* [hereinafter referred to as Docket No. 81–127].

Meanwhile, the PUC's decision in Docket No. 81–191 was on appeal to this court.[5] CMP disagreed with the PUC's interpretation of section 131. The utility contended the statute did not allow the sales-related savings shares to be considered in the fuel adjustment clause. The PUC, on the other hand, argued for a broad interpretation of section 131(4) to allow the consideration of both purchase-related and sales-related savings shares in computing the fuel adjustment charge. We agreed with CMP's reading of the statute, deciding "the Legislature did not intend to include sales-related shares within the scope of the fuel cost adjustment," 458 A.2d at 741, and remanded the case to the PUC "for appropriate action consistent with the opinion herein." *Id.* at 742.[6]

On June 8, 1983, the PUC held a hearing on CMP's motion to implement the remand order. CMP demanded a fuel cost adjustment, under section 131(6), to recover the amount it would have received *via* the fuel adjustment clause in Docket No. 81–191 if the PUC had not erroneously decided to consider the sales-related savings shares in fuel costs. CMP claimed the PUC's error on this score had cost the utility approximately $5.7 million in fuel cost adjustment revenues it had not been allowed to collect from its customers. The PUC Staff resisted any fuel adjustment recovery by CMP and further contended if recovery were allowed the PUC's intervening action, taken in Docket No. 81–127, also should be considered. That decision had allowed CMP to increase its base rates by about $2.9 million, when the sales-related savings shares were withdrawn from the calculation of CMP's available base revenues in order to balance the effect of the earlier Docket No. 81–191 decision. The Staff argued part of the $5.7 million due to CMP because of the error in Docket No. 81–191 should be offset by the $2.9 million base rate increase approved in Docket No. 81–127.

The PUC order, entered October 21, 1983, decided two issues. First, the PUC agreed a fuel cost adjustment was appropriate to compensate CMP, retrospectively, for the error the Commission had made in Docket No. 81–191, as revealed by this court's decision. The Commission focused on the "plain language" of section 131(6)[7]

---

5. *Central Maine Power Company v. Public Utilities Commission*, 458 A.2d 739 (Me.1983).

6. On May 24, 1983, the legislature, by emergency legislation, enacted an amendment to § 131(4) to include sales-related savings shares. In its amended form, subsection 4 reads:

   4. *Scope of adjustment.* Changes in the cost of fuel consumed in the electric utility's generating stations and changes in the cost of power purchased by the electric utility for use in Maine shall constitute the only items subject to adjustment, pursuant to regulations promulgated by the commission under this section. Those changes in the cost of purchased power which are subject to that adjustment shall exclude all capacity charges, except that, to the extent the commission deems just and reasonable, capacity charges for power purchased from small power producers or cogenerators, as defined in section 2323, may be included in the adjustment. Credits received by the utility for fuel or the fuel component of either purchased power or power sold to other utilities, including, but not limited to, credits associated with purchased energy or energy sold which are received, from the savings fund of the New England Power Exchange, shall be considered changes in the cost of fuel for the purposes of the fuel cost adjustment, pursuant to regulations promulgated by the commission under this section.

7. 35 M.R.S.A. § 131(6) provides:

   6. *Calculation and billing of fuel adjustment.* Within 120 days following the effective date of this section, the commission shall establish rules and regulations for the calculation and billing of fuel cost adjustments. The rules and regulations shall include, but shall not be limited to:
   A. The fuel accounting method to be used to determine cost of fuel;

to authorize such retrospective adjustments to the calculation of the cost of fuel:

Accordingly, for the period covered by the Commission's decision in No. 81–191, and subsequent proceedings, there exists an "unrecovered" fuel cost amount, equal to that portion of CMP's NEPEX purchased power billings that would have been recoverable, but for the Commission's decision to set off NEPEX sales-related credits against those charges for fuel adjustment purposes. Because § 131 and our Rules clearly authorize recoupment in future sales of previously unrecovered fuel costs, we must include this under-recovery as a matter of law in a reconciliation adjustment.

Second, the PUC decided it could not order CMP's $5.7 million recovery to be offset in part by the amount of the reduction to base rates that would have occurred had CMP included the savings share credits as a reduction to its base rate revenue requirement at the time of the Docket No. 81–127 rate hearing. The Commission noted it lacks statutory authority to make retrospective adjustments to base rates. The PUC, in rejecting the Staff's contention that the proposed offset was part of the fuel cost adjustment reconciliation allowed by section 131 as related to the "cost of fuel," stated:

Under the terms of 35 M.R.S.A. § 131(4), "[c]hanges in the cost of *fuel*" [emphasis added] and "changes in the cost of power purchased by the electric utility for use in Maine" are the "only items subject to adjustment" in the fuel cost adjustment clause. The Court had concluded that sales-related savings

B. The fuel computation period and method of computation of fuel adjustment rate;
C. Definitions and components of fuel costs to be included in the fuel cost adjustment;
D. An appropriate method to amortize a utility's unrecovered reasonable fuel costs;
E. An appropriate method to credit customers for fuel cost overcharges; and
F. Reporting requirements to administer this section.

shares are not properly includible in the fuel adjustment clause. Therefore, the sales-related savings shares are clearly a *non-fuel* cost for purposes of Section 131 and are not subject to retroactive adjustment.

### III.

On this appeal, the Public Advocate does not contest the decision of the PUC to use the reconciliation clause of section 131(6) to return to CMP the revenues the utility lost during that period of time the sales-related savings shares were improperly factored into the fuel adjustment computations as a cost of fuel. However, the Public Advocate contends, as did the PUC Staff at the hearing, section 131 allows this fuel adjustment to be offset by the amount of the reduction to base rates that would have occurred if the sales-related savings shares had been included to reduce CMP's base revenue requirement at the time of the hearing in Docket No. 81–127. The Advocate argues the PUC erred in interpreting section 131, and the April 12, 1983, decision of this court, to preclude such offset. He proposes the offset need not be viewed as a retroactive adjustment to base rates, but may be deemed part of the fuel cost adjustment allowed under section 131.

■ Our review is limited to scrutiny of the decision of the Commission for errors of law. "We can only intervene when 'the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution ....'" *Mechanic Falls Water Company v. Public Utilities Commission,* 381 A.2d 1080, 1091 (Me.

The commission may, in its discretion, establish a fuel adjustment rate for a fuel computation period based on projected kilowatt hour sales and fuel costs for that period, and make appropriate adjustments for overcharges or undercharges in customer bills in subsequent computation periods to account for the difference between the projected kilowatt-hour sales and fuel costs and actual kilowatt-hour sales and reasonable fuel costs.

1977), quoting *New England Telephone & Telegraph Company v. Public Utilities Commission,* 148 Me. 374, 377, 94 A.2d 801, 803 (1953).

We discern no error in the PUC's interpretation of the fuel cost adjustment statute. The Commission is correct in its recognition that it cannot amend, *via* the fuel cost adjustment provisions of section 131(4), what it now perceives to have been error in the calculation of the base rates in Docket No. 81–127 on March 27, 1982. As the PUC recognized, implementation of the offset proposal, no matter how ingeniously it might be characterized, would necessarily involve a reconsideration of the calculations made in the base rate proceeding. It is well established that errors made in the calculation of a utility's base rates may be remedied only prospectively. As we stated in *First Hartford Corporation v. Central Maine Power Company,* 425 A.2d at 181, the Commission has no express, implied, or incidental power to revise base rates retroactively. *See New England Telephone & Telegraph Company v. Public Utilities Commission,* 362 A.2d 741, 753–56 (Me. 1976). To allow the offset proposed by the Public Advocate would, in our view, be merely an indirect route to retroactive rate-making, and could not legitimately be characterized as a permissible fuel cost adjustment. As we stated in *Central Maine Power Company v. Public Utilities Commission,* 405 A.2d 153, 171 (Me.1979), "a regulatory agency may not do by indirection what is forbidden it to do directly."

Finding no error of law in the Commission's decision following this court's remand order,

The entry is:

Public Utilities Commission order of October 21, 1983, affirmed.