STATE OF MAINE
KENNEBEC, ss

SUPERIOR COURT
AP-10-11

.1MM KEN- 3/17/2011

ELLEN M. GOODRICH,
        Petitioner

        v.

BOARD OF TRUSTEES of
Maine Public Employees Retirement
System
        Respondent

ORDER ON APPEAL
OF ADMINISTRATIVE ACTION
PURSUANT TO RULE 80C

Pending before the court is the March 4, 2010 appeal by the petitioner, Ellen M.

Goodrich, from the February 23, 2010 decision of the Board of the Maine Public Employees

Retirement System ("MPERS") denying Goodrich's appeal from a Hearing Officer's decision

and upholding denial of her request for Group Life Insurance ("GLI") coverage. Goodrich

contends that the MPERS Board's decision is in violation of statutory provisions, is unsupported

by substantial evidence on the record as a whole, and is arbitrary and capricious and

characterized by an abuse of discretion. The parties were heard at oral argument on September

9, 2010. The court has reviewed the record, considered the parties' written and oral

presentations, reviewed pertinent case law, and issues the following order.

**Factual Background**

The facts, as found by MPERS, do not appear to be in dispute. The petitioner, age 52,

resides in Vassalboro, Maine and has worked for School Union 52 for twenty-five years.[1] (R.

10.11, 25.5.) She is currently an education technician II. (*Id.*) Although she became eligible for

---

[1] The facts as adduced by MPERS are now slightly out of date; the petitioner is fifty-five years old at the time of this order, and has worked for School Union 52 since 1985, plus one year of previous employment. (R. 10.19, 1.28.)

1

GLI coverage in 1995, when educational technicians became classified as teachers for retirement system purposes, her employer did not inform her of this status. (R. 10.12-10.13, 25.5.)

On September 18, 2006, Lynn Pease, Survivor Services Supervisor at MPERS[2], wrote to Ms. Goodrich, indicating that MPERS could not ascertain whether her employer had provided her a GLI application when she became eligible. (R. 1.10, 25.5.) Quoting the Maine State Retirement System Rule 601[3], the letter explained,

> "Whenever it is determined...that, through an error by MSRS personnel or payroll personnel, deductions for insurance are not taken, the participant will be given the option to:
> 1. Pay back premiums from the date of eligibility or date last payments were taken;
> 2. File evidence of insurability with coverage effective on the date approved by the insurance company from which the policy was purchased; or
> 3. Wait for an open enrollment". (There are no plans for an open enrollment in the near future.)

(R. 1.10.) The letter went on to provide, "If you choose to select coverage and pay back premiums or are refusing coverage you should complete an Application for Group Life Insurance Coverage. . . . If you select coverage we will calculate the premiums due from the date of your eligibility of March, 1997[4] through the present and notify you of the amount." (Id.) The letter concluded, "If we have not received a response by October 18, 2006, you will be considered to

---

[2] At the time, MPERS was known as the Maine State Retirement System, or MSRS. (See letter, R. 1.10.)

[3] Now 94-411 C.M.R. ch. 601, § 4 provides:
> 4. Whenever the Executive Director determines that an employee lacks coverage or has a lapse in coverage due to error on the part of the employer or MainePERS, coverage may be implemented or reinstated as follows:
> A. Participant, or employer in the case of employer-paid premiums, pays back premiums from the date of eligibility or the date of last payment to the present;
> B. Participant files Evidence of Insurability with coverage effective on the first day of the month following one month of additional employment in an eligible position beyond the date approved by the insurer under contract with MainePERS.
> In the event that the insurer denies coverage based on Evidence of Insurability, the participant may restore coverage under the provisions of paragraph A.

[4] Although the letter indicates that the petitioner became eligible for GLI in 1997, all parties agree that she actually became eligible in 1995. (R. 25.5, n.1.)

have refused coverage." (*Id.*) The petitioner acknowledged receiving the letter (R. 10.11, 25.5), but did not respond within thirty days or by the October 18, 2006 deadline. (R. 25.5.) She testified before the hearing officer that she did not elect option one, payment of back premiums, because she "did not feel it was [her] responsibility to pay back the premiums for something that [she] never received," and that it was not her fault that she had not had the insurance coverage initially. (R. 10.12.)

In January 2007, the petitioner filed a Request for Basic and / or Additional Insurance Coverage Requiring Evidence of Insurability with MPERS, noting on the application that she did not wish to make back premium payments. (R. 1.28, 25.5.) The record does not show whether the petitioner submitted the requisite evidence of insurability to Aetna at that time. (R. 25.5.) In June 2007, the petitioner's counsel requested that MPERS review the petitioner's eligibility based upon her recent submission. (R. 1.38, 25.5.) In July 2007, Ms. Pease informed the petitioner's counsel that Aetna had not received the required evidence of insurability form and requested that the petitioner submit one. (R. 1.35, 25.5.) In October 2007, the petitioner filed another Request for Basic and / or Additional Insurance Coverage Requiring Evidence of Insurability. (R. 1.34, 25.5.) In November 2007, the petitioner filed the appropriate form with Aetna. (R. 10.24-25, 25.5.) In January 2008, Aetna notified the petitioner that it was declining coverage due to her current medical conditions. (R. 1.26-1.27, 25.5-25.6.)

In February 2008, the petitioner, through counsel, informed MPERS that Aetna had declined to insure the petitioner, and she requested that MPERS provide her with GLI on a prospective basis without requiring payment of back premiums. (R. 1.24, 25.6.) On March 10, 2008, Lynn Pease denied the petitioner's request on behalf of MPERS, explaining that because the petitioner had neither paid back premiums nor provided evidence of insurability within thirty

3

days from the September 2006 notification letter, she was considered to have refused coverage, and since her evidence of insurability resulted in denial of coverage by Aetna, she would remain refused. (R. 1.23, 25.6.) On or about April 11, 2008, the petitioner, through counsel, requested that the case be expedited in order for it to be consolidated with two other similar cases that were awaiting final decision by John C. Milazzo, Chief Deputy Executive Director and General Counsel of MPERS. (R. 1.21.) The record does not reflect any consolidation of this case with other pending cases. On April 18, 2008, Marlene McMullen-Pelsor, Manager of Payrolls Administration, Employer and Ancillary Services for MPERS, affirmed Ms. Pease's decision denying GLI coverage to the petitioner. (R. 1.22, 25.6.) On April 29, 2008, the petitioner appealed that decision on the ground that she had been entitled to GLI from 1995 on and that she had never refused it, in 1995, 1997, or 2006. (R. 1.18, 25.6.) On June 9, 2008, General Counsel Milazzo issued an Initial Decision affirming the staff's decision that the petitioner was not eligible for GLI coverage at that time because she had not complied with the terms of the September 2006 letter, so her only remaining option "was to apply under the evidence of insurability procedure," and Aetna's denial under that procedure was final. (R. 1.7-1.10, 25.6.) General Counsel Milazzo's final decision, issued December 9, 2008, attached and incorporated the initial decision because the petitioner had not presented new evidence or new arguments subsequent to the initial decision. (R. 1.5.)

The petitioner's appeal of General Counsel Milazzo's final decision was heard before hearing officer Rebekah Smith on March 27, 2009. (R. 10.1 et seq.) The hearing officer's report, dated June 3, 2009, recommended affirming General Counsel Milazzo's decision because the petitioner "did not enroll when initially offered the opportunity in 2006 and, as an employee later seeking coverage, she has been denied coverage by the insurer after submitting evidence of

4

insurability." (R. 21.7.) MPERS's Board of Trustees adopted the recommendation of the hearing officer and, in a final decision dated February 23, 2010, affirmed General Counsel Milazzo's denial of GLI to the petitioner. (R. 25.9.) The petitioner timely appealed to this court.

## Standard of Review

When reviewing an agency decision in its appellate capacity, "[t]he standard of review is 'limited to whether the governmental agency abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record.'" *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 8, 762 A.2d 551, 555 (quoting *Davric Maine Corp. v. Maine Harness Racing Comm'n*, 1999 ME 99, ¶ 7, 732 A.2d 289, 293) (brackets omitted); *see also* 5 M.R.S. § 11007(4)(C) (2010) (On review, "[t]he court may . . . [r]everse or modify the decision if the administrative findings, inferences, conclusions or decisions are . . . [i]n violation of constitutional or statutory provisions [or u]nsupported by substantial evidence on the whole record"). "When the dispute involves an agency's interpretation of a statute administered by it, the agency's interpretation, although not conclusive, is entitled to great deference and will be upheld unless the statute plainly compels a contrary result." *Maritime Energy v. Fund Ins. Review Bd.*, 2001 ME 45, ¶ 7, 767 A.2d 812, 814 (quotations omitted).

"A person aggrieved by final agency action, stemming from an agency's adjudicatory role in which the agency has applied an agency regulation, may challenge both the agency action and the validity of the rule in the Superior Court action." *Conservation Law Found. v. Dep't of Envtl. Prot.*, 2003 ME 62, ¶19, 823 A.2d 551, 558. "The standard of review for a challenge to the validity of a rule, whether raised in a declaratory judgment action or a Rule 80C petition, is contained in 5 M.R.S.A. § 8058(1)." *Id.* at ¶21, 823 A.2d at 559.

> If the rule exceeds the rule-making authority of the agency, it is invalid. *5 M.R.S.A. § 8058(1)*. If a rule does not exceed the rule-making authority, the court

next reviews "any other procedural error" related to the promulgation of the rule. *Id.* . . . Finally, if the rule is procedurally correct and within the agency's rule-making authority, it is reviewed substantively "to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.*

*Id.* Because the petitioner's appeal also consists of an attack upon the regulation applied as arbitrary and capricious and contrary to statute, the court must consider the standard of review for agency rules and regulations as well.

## Discussion

The court agrees with MPERS's delineation of the issues in this case:

I. Whether Petitioner's automatic eligibility for GLI coverage began one month and one day after her first day of eligible employment in 1995, and expired thirty-one days thereafter.

II. Whether Petitioner refused GLI coverage in 2006 pursuant to Rule 601.

(Br. of Resp. at 2.) The corollary subissue to issue II, then, is whether the provisions of Rule 601 under which the Petitioner may or may not have refused coverage are sustainable. The court will address the issues in turn.

## I. Statutory and Regulatory Framework

The legislature provided that basic GLI "must be available to all eligible participants" in MPERS, including teachers.[5] 5 M.R.S. §§18056, 18055 (2010). When an employee becomes eligible for MPERS membership, he or she is "automatically insured for the amounts of basic [GLI coverage], beginning on the first day of the month following one month of employment after the employee becomes eligible. Each employee shall complete an application for insurance coverage within 31 days of becoming eligible." 5 M.R.S. §18058(1) (2010). "Any employee not wanting to be insured under this subchapter, at the time the employee first becomes eligible, shall, on the application form, give written notice to the employee's employing officer and to the

---

[5] As an educational technician, the petitioner is a "teacher" for MPERS's purposes. *See generally* 5 M.R.S. §17001(42) (2010).

6

retirement system that the employee does not want to be insured." 5 M.R.S. §18058(2) (2010).

The statute is silent regarding coverage of employees who neither complete an application nor decline coverage in writing. The regulations, 94-411 Chapter 601 (Eff. July 12, 1979) ("former Rule 601"),[6] attempt to fill the gap by providing in part that "[GLI c]overage on any participant . . . will cease at the end of the last period for which premiums are paid [to MPERS], subject to a 31-day grace period." Rule 601(4)(A).[7]

As to reinstatement of previously waived GLI coverage, the legislature established two debatably applicable provisions:

> C. Any employee who does not want to be insured or who cancels insurance coverage may subsequently apply for insurance, but must produce evidence of insurability at the employee's own expense and in accordance with the requirements of the insurance underwriter.

> D. Any employee who, during a period of unpaid military leave of absence, does not continue coverage while on unpaid military leave must be reinstated to the levels of coverage in effect immediately prior to the unpaid military leave. A request for reinstatement by the employee must be made within 31 days of the employee's return to work following unpaid military leave. An employee who wants to be reinstated and who does not apply for reinstatement within 31 days of the employee's return to work from unpaid military leave must produce evidence of insurability at the employee's own expense and in accordance with the requirements of the insurance underwriter.

5 M.R.S. §§18058(2)(C), 18058(2)(D) (2010). MPERS's regulations, however, explicitly address the situation at hand:

> Whenever it is determined by the Executive Director that, through an error by [MPERS] personnel or [employer] payroll personnel, deductions for insurance are not taken, the participant will be given the option to:
> 1. Pay back premiums from date of eligibility or date last premiums were taken;

---

[6] 94-411 Chapter 601 was repealed and replaced by a new Rule 601 effective January 20, 2008. MPERS analyzed the petitioner's appeal under the former rule because the petitioner was first notified of her eligibility in September 2006, and first sought GLI from MPERS by her communication of January 12, 2007. The petitioner has not contested MPERS's choice of rule.

[7] The current version of Rule 601(4)(1) likewise provides, "Coverage on any participant . . . will cease at the end of the last period for which premiums for that participant . . . are paid to the Maine Public Employees Retirement System, subject to a 31-day grace period."

2. File evidence of insurability with coverage effective on the date approved by the insurance company from which the policy was purchased; or

3. Wait for open enrollment.

Rule 601(4)(C) (1979).[8]

## II. The Petitioner's Automatic Eligibility for GLI and Its Expiration Or Lack Thereof

MPERS asserts that the statute's withholding of coverage to the new employee for one month and one day exists to allow the employee time to either (1) complete the GLI application and authorize premium deductions (without which the automatic coverage terminates after a grace period of thirty-one days), or to (2) refuse the GLI coverage in writing. *See* 5 M.R.S. §18058(1), (2). Because GLI coverage is a cost to the employee, and is optional, MPERS explains, an employee must affirmatively apply for coverage and authorize their employer to withhold premiums. If the premiums are not withheld and paid to MPERS, the GLI coverage is not funded, and coverage terminates "by operation of law." (Br. of Resp. at 8.) MPERS thus asserts that, since the petitioner never completed an application and authorized withholding of premiums due to an error by her employer, School Unit 52, she did not fund GLI coverage and her automatic coverage expired in 1995 at the conclusion of the thirty-one day grace period.

The petitioner appears to agree in part and disagree in part with this analysis. Her brief recognizes that "continued membership [in GLI] was conditional upon the employer withholding

---

[8] The current Rule 601(4)(4) provides:
> Whenever the Executive Director determines that an employee lacks coverage or has a lapse in coverage due to error on the part of the employer or MainePERS, coverage may be implemented or reinstated as follows:
>> A. Participant, or employer in the case of employer-paid premiums, pays back premiums from the date of eligibility or the date of last payment to the present;
>> B. Participant files Evidence of Insurability with coverage effective on the first day of the month following one month of additional employment in an eligible position beyond the date approved by the insurer under contract with MainePERS.
>
> In the event that the insurer denies coverage based on Evidence of Insurability, the participant may restore coverage under the provisions of paragraph A.

8

and sending to [MPERS] the necessary premiums. Ch. 601(6)(A). The employer, having failed to do so, caused Ms. Goodrich's coverage to lapse. Ch. 601(4)(A)." (Br. of Pet. at 7.) Despite acknowledging the cancellation of coverage, the petitioner argues that MPERS is precluded from denying her coverage because she became a de jure member of the GLI plan for "basic insurance" and never waived that membership in writing, as required by 5 M.R.S. §18058(2). She contends that the legislature intended for her to automatically have "basic insurance," which she would have but for the errors of both her employer and MPERS, errors that have deprived her of that benefit. (Br. of Pet. at 3-4, 8.) She asserts that the legislatively imposed obligation is upon MPERS and the public employer to assure that the necessary premiums are deducted from the pay of all teachers, just as the obligation is upon them to deduct contributions for the Retirement program. (*Id.*) Just as retirement contributions are mandatory, GLI premiums are "automatic," unless specifically declined by the member in writing. (*Id.*) She distinguishes basic insurance, which is automatic and does not require evidence of insurability or an application in order for coverage to apply, from supplemental or dependant insurance, which are optional and may require evidence of insurability if they are not timely applied for. (Br. of Pet. at 4-6.) The petitioner continues:

> She became a de jure member of the [GLI] Program upon the first date of her employment in 1995. When the employer failed, however, to make deductions and contributions to [MPERS] for the insurance coverage, shortly after her beginning date in 1995, coverage was cancelled due to the nonpayment of premiums. Rule 94-411 Chapter 601(4)(A). Nevertheless, by the terms of the statute she was "automatically" enrolled in GLI upon the beginning of her employment and, the failure of her employer to withhold any pay premiums is not in any sense a written refusal of the employee.

(Br. of Pet. at 9.) The court, though unclear on the petitioner's assertion of her status as regards coverage between the time of cancellation and the present, interprets the petitioner's argument as

relating to the second issue, her alleged 2006 refusal of coverage, rather than to her automatic coverage beginning in 1995.

The court agrees with the parties regarding the status of the petitioner's insurance: the petitioner's automatic GLI coverage began one month and one day after her first day of eligible employment in 1995, and lapsed thirty-one days later, as no premiums were paid. Therefore, the petitioner has not had GLI coverage at any point since 1995, and, since no premiums have been paid at any time, does not currently have such coverage.

## III. Refusal Pursuant to Rule 601

The petitioner contends that basic insurance, unlike optional supplemental or dependent insurance, requires waiver in writing in order for it *not* to apply. The requirement of a written waiver applies not only at the initial time of eligibility, she asserts, but rather at any time that the employee learns of her entitlement to GLI, particularly where her earlier lack of knowledge was not due to her own error, but rather that of her employer. Therefore, she asserts, since she never waived basic GLI coverage in writing, but rather attempted to opt in after she was informed that she was eligible for GLI (although she admits that her request for coverage was made "three months too late"), MPERS is precluded from finding that she declined or refused coverage. (Br. of Pet. at 8.) Since 5 M.R.S. §18058(2) allows MPERS to require evidence of insurability only in cases where the employee has waived or cancelled coverage, she continues, MPERS's decision requiring her to show evidence of insurability in order to qualify for GLI is unenforceable and in violation of the statute. The petitioner supports her interpretation of the statute by reference to *Whitley v. Bd. of Trustees*, 2009 Me. Super. LEXIS 158, wherein the Superior Court (Kennebec County, Jabar, J.) held that an education technician to whom MPERS denied GLI "was automatically insured, and because she never declined this enrollment through

written notice, [MPERS] must provide GLI—basic insurance—to her." *Whitley*, 2009 Me. Super. LEXIS 158 at *9.

MPERS counters first by distinguishing *Whitley* on its facts, and then asserting that *Whitley* does not offer this court any guidance because it represents an incorrect assessment of the GLI statute. (Br. of Resp. at 8-9.) MPERS next asserts that "Rule 601 provides the only means to restore the member to the same position she would have been in, had the premiums been paid when first becoming eligible." (Br. of Resp. at 9.) It explains that retroactive payments to the eligibility date attempt to mimic the circumstances when coverage was first offered, that is, from when the employee was first hired and presumably was young and healthy, so that MPERS has the benefit of the premium payments in before it is likely that the employee would require a GLI payment out. (*Id.*) MPERS then explains that submitting evidence of insurability likewise "demonstrates to the insurer that the employee is currently healthy and death benefit payments are not immediately anticipated." (Br. of Resp. at 10). MPERS contends that it provided the petitioner with the three options set forth in former Rule 601 in September 2006, and clearly stated that failure to respond within thirty days would be deemed a refusal of GLI coverage. (Br. of Resp. at 10.) MPERS reads 5 M.R.S. §18058(2) to require written refusal of GLI only at the time of initial eligibility. (*See* Br. of Resp. at 11.) Therefore, on October 19, 2006, thirty days after MPERS sent the letter, when the petitioner had not responded to the letter, MPERS considered her silence to be a formal refusal or waiver of GLI coverage. MPERS explains that its determination of a thirty-day response deadline is reasonable and sustainable because it would be fiscally irresponsible to allow an employee unlimited time to decide whether to opt in to GLI, and the Board found thirty days to be a reasonable time limit under the circumstances, and it further notes that an agency need not enact rules to cover every decision it

11

makes, including determining deadlines necessary for effective administration of the retirement system. (Br. of Resp. at 10.) Having determined that the petitioner refused coverage by her silence, 5 M.R.S. §18058(2)(C) provides that a person who has refused coverage "must produce evidence of insurability at the employee's own expense and in accordance with the requirements of the insurance underwriter" in order to apply for GLI. Since Aetna has declined the petitioner's evidence of insurability, in light of her deemed refusal of coverage, she is statutorily precluded from receiving GLI by any other method.

This disputed issue comes down to statutory interpretation: if the petitioner can refuse coverage by thirty days' silence in 2006, then MPERS is correct, and the petitioner can only obtain insurance by showing evidence of insurability. If the petitioner is correct and the statute requires a written refusal of coverage in order for an employee to waive GLI, as the Superior Court found in *Whitley*, then she should be eligible to pursue GLI coverage through the methods provided in Rule 601. Nonetheless, even if the petitioner is correct and she is entitled to pursue GLI, her entitlement to GLI is subject to the obligations set forth in the statute, regulations, and contractual provisions. The court first turns to the analysis of the same statutory interpretation issue in *Whitley*.

> Judith Whitley [was] an Educational Technician II who work[ed] for School Union 52. When hired in 1995, she became eligible to participate in the MainePERS Retirement and Group Life Insurance ("GLI") Program. She was not informed about this availability until 1997. [Whitley] joined the System and automatically became insured under the GLI Program. She was required to file an application within 31 days, and she indicated she did so in March of 1997. On June 5, 1997, she filled out a Designation of Beneficiary Group Life Insurance Program form.
> The Board of Trustees' final decision states that [Whitley] submitted an enrollment form for GLI, which was apparently never processed. . . .
> Ms. Whitley filed an GLI application in 1997. . . . It appears that the application was lost or not processed for some reason and Ms. Whitley was told at the time that there was no application on file. The Board found that by not taking any further action she . . . effectively declined enrollment.

12

. . . On March 6, 1998, the System wrote [Whitley] a letter indicating that School Union 52 had been informed of its responsibility to make back contributions to the System without mentioning the GLI Program. On October 27, 2004, the System wrote [Whitley] a letter setting out three options in order for her to enroll for GLI: (1) pay back premiums from the date of eligibility, (2) file evidence of insurability, or (3) wait for open enrollment. The letter warned her that if she chose the "evidence of insurability" option but was denied, she could not then elect to pay back the premiums. Finally, the letter indicated that if she did not return an application by November 24, 2004, she would be considered to have refused coverage. [Whitley] never responded.

In April of 2006, the System sent a form to [Whitley] indicating she was not eligible for GLI because she worked part-time. In October of 2006, [Whitley] was told by the System to fill out the GLI enrollment form and file evidence of insurability. She was denied coverage on the basis of her insurability due to several medical conditions.

. . . . The Board's final decision concluded:

> Appellant is not eligible for GLI at this time because she did not enroll when initially offered the opportunity in 1997 and as an employee later seeking coverage, she has been denied coverage by the insurer after submitting evidence of insurability.

*Whitley*, 2009 Me. Super. LEXIS 158 at *1-*4 (some internal quotations omitted). While Whitley's situation is factually distinguishable from Ms. Goodrich's in that Whitley filed an application that MPERS lost,[9] whereas Ms. Goodrich was unaware of her eligibility or need to file an application, the two petitioners were in similar positions after receiving notification from MPERS and belatedly attempting to opt in to GLI coverage.

But *Whitley*'s value is greater for its analysis of the statute than it is for the similarity of the facts, so the court turns to the statutory analysis portion of the case.

> *5 M.R.S. β 18058(1)* states that all employees are "automatically insured" for "basic insurance" and that each "employee shall complete an application for insurance coverage within 31 days of becoming eligible." Following this language, section 1(C) states: "If an application is not completed within 31 days of the employee's first becoming eligible, the employee may subsequently apply for supplemental and dependent insurance but must produce evidence of insurability at the employee's own expense ...." *Id. β 18058(1)(C)*. The statute does not provide sanctions (*i.e.*, the required production of "evidence of

---

[9] Another dissimilarity between the cases, but one which does not affect the court's statutory analysis, is that in Whitley's case, MPERS wrote to Whitley, indicating that Whitley's employer had been informed of its responsibility to make back contributions to MPERS.

insurability") in regard to basic insurance if the employee fails to complete the application within 31 days. It does provide that if the application is not completed within 31 days, then subsequently applying for "*supplemental*" and "*dependent*" insurance, requires evidence of insurability. Section 1(C) does not mention basic insurance. This can only mean that the employee is automatically covered with basic insurance but needs to request the additional coverage for "supplemental and dependent insurance." *See, e.g., Musk v. Nelson, 647 A.2d 1198, 1201-02 (Me. 1994)* ("[A] well-settled rule of statutory interpretation states that express mention of one concept implies the exclusion of others not listed."). Because basic insurance is automatically available to the employee, there is no need to provide for requirements for subsequent enrollment, unlike supplemental and dependent Insurance.

Furthermore, *5 M.R.S. ß 18058(2)* provides a mechanism for "written notice" for any employee not wanting to be insured. This section of the statute affirmatively sets forth the requirement that if an employee wants to decline insurance, "written notice to the employee's employing officer and to the retirement system" must be given. *Id. ß 18058(2).* This provision further demonstrates the nature of the "automatic" enrollment for basic insurance. There is simply no evidence indicating that petitioner declined the automatic coverage, and the System's assumption that petitioner was deemed to have declined it because she failed to fill out the application is not supported by the relevant statute. . . .

Simply stated, the petitioner was automatically insured, and because she never declined this enrollment through written notice, the System must provide GLI-- basic insurance--to her. The question regarding petitioner's obligation to pay for the premiums that were never collected is a concern beyond the present issue before the court, which is whether the Board erred in concluding that petitioner was not automatically insured pursuant to Maine law. Nevertheless, on remand the System should work with the petitioner and School Union 52 to determine how she is to pay for the coverage she should have had.

*Whitley*, 2009 Me. Super. LEXIS 158 at *6-*9 (footnote omitted).

While the court appreciates the *Whitley* court's analysis of the statute, and agrees that justice mandates the result reached in that case, the court does not agree with the entirety of *Whitley*'s statutory interpretation. Reading *Whitley*'s statutory analysis section on its own— without the factual context underlying that case—would suggest that an employee could be covered indefinitely without ever filling out an application for GLI or making a single premium payment, as long as he or she had not declined GLI coverage in writing. If this were the case, no

employee would ever need to complete an application for GLI or make premium payments,[10] yet MPERS would be obligated to provide basic GLI to all employees without funding or applications since they are automatically insured. *See Whitley*, 2009 Me. Super. LEXIS 158 at *9. The court does not agree with this interpretation. The *Whitley* court's analysis of the statute is properly considered in light of the fact that Whitley did indeed submit a proper and timely application for GLI, such that denial of the efficacy of her coverage was inconsistent with the statute. *Whitley* cannot be read to mean that any employee without application or payment is automatically and indefinitely insured by MPERS for GLI.

The statute provides that employees are "automatically insured," but it does not provide that the automatic coverage endures indefinitely without application or premium payments; indeed, the same provision that supplies the automatic basic GLI coverage also provides, "Each employee *shall* complete an application for insurance coverage within 31 days of becoming eligible." 5 M.R.S. §18058(1) (emphasis added). The provisions of that statute establish that supplemental and dependent insurances are contingent upon the timely filing of an application for GLI, and that if the application is not timely filed, then those forms of insurance will require evidence of insurability. The statute is silent as to the effect of an untimely application upon basic insurance. MPERS regulations—specifically, Rule 601—determine the boundaries of coverage in a way that is not inconsistent with the statute by providing that "[c]overage on any participant . . . will cease at the end of the last period for which premiums for that participant . . . are paid to [MPERS], subject to a 31-day grace period." Fmr. 94-411 Ch. 601(4)(A).

An agency's interpretation of a statute it administers, "although not conclusive on the court, 'is entitled to great deference and will be upheld unless the statute plainly compels a

---

[10] Indeed, the incentives against filing an application and authorizing premium payments would be very strong.

contrary result.'" *Bischoff v. Me. State Ret. Sys.*, 661 A.2d 167, 169 (Me. 1995) (quoting *Abbott v. Commissioner of Inland Fisheries & Wildlife*, 623 A.2d 1273, 1275 (Me. 1993)). "[The Law Court has] struck down Board rules when they directly conflict with express statutory language." *Baker v. S.D. Warren Co.*, 2010 ME 87, ¶15, 3 A.3d 380, 384. Where, "however, there is no direct conflict between the . . . statute and the rule," and "the consequences of the new rule are not in conflict with the statute," the court will defer to the Board. *Id.* at ¶15, 3 A.3d at 385; *see also Jasch v. The Anchorage Inn*, 2002 ME 106, ¶10, 799 A.2d 1216, 1218-19. Here, the regulation gives effect to the language and intent of the statute—the legislature clearly intended that employees should be automatically covered and should be entitled to basic GLI, and also that they should complete an application for that coverage—while also fulfilling the legislature's intent that MPERS remain solvent (*cf.* 5 M.R.S. §18054 (2010) ("All expenses of a group life insurance program shall be reimbursed from premium rate adjustments, dividends or interest earnings on reserves"); 5 M.R.S. §18059 (2010) (authorizing MPERS's Board to set premiums "on the basis determined by the board to be actuarially sufficient to pay anticipated claims")) by setting limits upon GLI coverage for those employees who have not contributed premiums or completed an application.

In light of this analysis, the provision of former Rule 601 limiting coverage to those employees who have completed an application within thirty-one days of their first eligibility (as required by 5 M.R.S. §18058(1)) and authorized the withholding of premium payments, plus a thirty-one day grace period to ensure coverage of those employees who desire GLI but did not act quickly enough, is sustainable and is not in direct conflict with the statute. It is understandable and reasonable that MPERS would need to limit GLI coverage to those who contribute premium payments to purchase that coverage and the peace of mind that accompanies

16

it. The court thus finds that the petitioner's interpretation of the statute as providing automatic and eternal basic GLI, even in the absence of application or payments, is not sustainable.

The court next turns to the parties' arguments regarding the necessity of a written waiver or refusal of GLI. MPERS suggests the requirement of a written waiver is limited to the period of the employee's initial eligibility, such that an employee may waive or refuse coverage by silence at any time subsequent to the time of initial eligibility; the petitioner, on the other hand, contends that the requirement of a waiver in writing is unlimited and requires a written refusal at any time before basic GLI may be denied. MPERS's board below explicitly found "that 5 M.R.S. § 18058(2) requiring 'written notice' of refusal applies only when an employee 'first becomes eligible' for GLI coverage and not thereafter." (R. 25.8.)

"When interpreting statutes, we 'seek to discern from the plain language the real purpose of the legislation, avoiding results that are absurd, inconsistent, unreasonable, or illogical.'" *Int'l Paper Co. v. Bd. of Envt'l Prot.*, 629 A.2d 597, 599-600 (Me. 1993) (quoting *Mahaney v. State*, 610 A.2d 738, 741 (Me. 1992)). "When the dispute involves an agency's interpretation of a statute administered by it, as is the case here, the agency's interpretation, although not conclusive on the court, is entitled to great deference and will be upheld unless the statute plainly compels a contrary result." *Id.* at 600.

The provision at issue states: "Any employee not wanting to be insured under this subchapter, at the time the employee first becomes eligible, shall, on the application form, give written notice to the employee's employing officer and to the retirement system that the employee does not want to be insured." 5 M.R.S. §18058(2). The statute goes on to provide, "If after being insured, the employee wishes to cancel or reduce coverage, written notice must be given by the employee to the employee's employing officer and to the retirement system." 5

M.R.S. §18058(2)(A) (2010). The statute thus covers two instances when an employee can and must decline GLI coverage in writing: (1) "at the time the employee first becomes eligible," and (2) "after being insured." 5 M.R.S. §18058(2), 5 M.R.S. §18058(2)(A). The court notes that coverage is automatic, and the regulations provide a thirty-one day grace period even for those employees who have not completed applications or paid premiums, consistent with the legislative intent that all eligible employees should automatically receive basic GLI coverage. Therefore, one of the two situations provided for by statute always applies—either the employee declines GLI during the window of initial eligibility, or the automatic basic coverage kicks in and anytime thereafter, the employee is in the position of "after being insured." The statute thus requires a clear written record of whether the employee has opted out of the GLI coverage, no matter at what time that refusal occurs. The statute does not preclude MPERS from discontinuing coverage based upon nonpayment of premiums or failure to submit an application; the statute's requirements are directed to the employee, rather than to MPERS.

The Law Court has "held that in construing legislative acts, all parts thereof must be taken into consideration to determine legislative intent." *Int'l Paper Co.*, 629 A.2d at 600-01 (quotation omitted). Adopting the Board's interpretation would effectively delete the entire provision of 5 M.R.S. §18058(2)(A) from the statute. Such an interpretation is clearly in conflict with the plain language of the statute. The court therefore reverses MPERS's board's determination that waiver or refusal need only be in writing at the time of the employee's initial eligibility. Under the plain language of the statute, the employee's waiver or refusal must be in writing at any time during the initial window of eligibility pursuant to §18058(2), or thereafter pursuant to §18058(2)(A).

18

This does not mean, as the petitioner contends, that she is therefore entitled to GLI coverage because she did not waive or refuse it in writing. The court observes above that an employee's coverage can lapse due to nonpayment of premiums without the employee taking any affirmative action whatsoever, whether to actively accept or actively waive GLI coverage. Although the coverage is automatic, as the petitioner points out, the court finds that it does not continue indefinitely without action from the employee. A failure of coverage due to nonpayment of premiums, however, is not equivalent to a refusal of coverage. As the court notes above, the statute requiring written notice of refusal is binding upon the employee, rather than MPERS, and if the employee wishes to decline or refuse coverage at any time, whether upon initially becoming eligible or after being insured, he or she must do so in writing. According to the requirements of the statute, if the employee does not decline or refuse coverage in writing and notify the employing officer and MPERS, it does not constitute a refusal, although the employee may endure a legitimate cancellation of GLI coverage due to nonpayment of premiums or failure to file an application.

Applying this framework to the facts, the petitioner's silence upon being notified in 2006 of her eligibility for GLI could not have been a refusal. The statute dictates that a refusal must be in writing and addressed to the employer and to MPERS. The petitioner may have allowed her potential coverage to lapse after being notified of her eligibility in 2006, but she did not take the affirmative steps required to refuse or cancel GLI coverage.

MPERS's determination that the petitioner cannot qualify for GLI is based upon a determination that she refused coverage by her silence in response to the September 2006 letter, which refusal would make 5 M.R.S. §18058(2)(C) applicable to her. That provision states, "Any employee who does not want to be insured or who cancels insurance coverage may subsequently

apply for insurance, but must produce evidence of insurability at the employee's own expense and in accordance with the requirements of the insurance underwriter." Under the provisions of 5 M.R.S. §§18058(2) and 18058(2)(A), the court has determined that the petitioner is not an employee who canceled coverage, since she did not refuse or cancel her coverage in writing; in order for 5 M.R.S. §18058(2)(C) to apply, therefore, the petitioner would have to be "[a]n employee who does not want to be insured." The record is rife with indications, ranging from the petitioner's counsel's letters to MPERS, to the many levels of internal administrative appeals of her denial of GLI, to the present 80C appeal to this court from MPERS's decision denying her GLI, that the petitioner is at the opposite end of the spectrum from "[a]n employee who does not want to be insured," and that indeed, she badly wants to be insured. Because she is neither an "employee who does not want to be insured or who [has canceled] insurance coverage," 5 M.R.S. §18058(2)(C) does not apply to her.

There is no statutory provision, therefore, to address the petitioner's situation, that of an employee who, through no fault of her own, lost coverage after her initial period of eligibility due to error on the part of her employer. Though the statute does not specifically cover the petitioner's circumstances, former Rule 601 contains provisions covering the situation where, "through an error by [MPERS] personnel or [employer] payroll personnel, deductions for insurance are not taken." Fmr. 94-411 Ch. 601(4)(C) (1979). That regulation provided that the petitioner could either (1) "Pay back premiums from date of eligibility or date last payments were taken," that is, eleven years earlier; or (2) "File evidence of insurability with coverage effective on the date approved by the insurance company from which the policy was purchased," as the parties agree that the third option, an open enrollment period, was not anticipated. Fmr.

20

94-411 Ch. 601(4)(C)(1), (2) (1979). If it is enforceable, then, this provision provides the exclusive method by which the petitioner may seek GLI coverage.

## IV. Enforceability of the Pertinent Provisions of Rule 601

As noted above, "The standard of review for a challenge to the validity of a rule . . . is contained in 5 M.R.S.A. ß 8058(1)." *Conservation Law Found.*, 2003 ME 62, ¶21, 823 A.2d at 559.

> If the rule exceeds the rule-making authority of the agency, it is invalid. *5 M.R.S.A. ß 8058(1)*. If a rule does not exceed the rule-making authority, the court next reviews "any other procedural error" related to the promulgation of the rule. *Id.* . . . Finally, if the rule is procedurally correct and within the agency's rule-making authority, it is reviewed substantively "to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.*

*Id.*

Whether the agency exceeded its statutory authority or violated other statutes in promulgating its regulations is an issue of statutory interpretation. *See id.* at ¶23, 823 A.2d at 559. "When a statute or statutory scheme is unambiguous, we ascertain the intent of the Legislature from the plain language. When there is ambiguity, however, we defer to the interpretation of a statutory scheme by the agency charged with its implementation as long as the agency's construction is reasonable." *Id.* (citation omitted). "A particular statute is not reviewed in isolation but in the context of the statutory and regulatory scheme." *Id.* "Furthermore, if the Legislature's intent is not expressed unambiguously and the interpretation of the statutory scheme involves issues that are within the scope of the agency's expertise, then the agency's interpretation must be given special deference." *Id.*

MPERS's board has general rule-making authority pursuant to 5 M.R.S. §18053, which provides, "The board may promulgate and publish, in accordance with chapter 375, subchapter

II, whatever rules are necessary and proper to give effect to the intent, purposes and provisions of this subchapter." 5 M.R.S. §18053 (2010). The subchapter whose intent, purposes and provisions are to be effectuated by the board's rules and regulations is Chapter 423, State Employees and Teachers, subchapter 6, Group Life Insurance (5 M.R.S. §§18051-18061). Chapter 375, subchapter II, governing the promulgation and publishing of the board's rules and regulations, consists of the rulemaking provisions of the Maine Administrative Procedure Act (5 M.R.S. §§8051-8064).

The petitioner's arguments that MPERS exceeded its authority by requiring payment of back premiums or evidence of insurability are in fact substantive challenges to the rule. The petitioner has not alleged that the rulemaking procedure underlying former Rule 601 was flawed, or the subject matter was beyond the agency's statutory authority.

Because the rule has not been shown to be procedurally incorrect or outside of the agency's rule-making authority, the court will review the regulation substantively to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *Conservation Law Found.*, 2003 ME 62, ¶21, 823 A.2d at 559.

The petitioner has long insisted that the requirement of payment of back premiums was neither equitable nor enforceable. *(See, e.g.,* R. 1.28 (1/12/07 Request for Basic and/or Additional Insurance Coverage Requiring Evidence of Insurability, marked, "I want insurance but do not want to make back payments"); R. 1.20 (2/6/08 Letter from Attorney Fontaine to Lynn Pease, stating, "I do not think this is legally permitted. [The petitioner] was not offered an opportunity to purchase the insurance in 1995 when she became an Educational Technician II, nor would the payment of all the back premiums up to today be equitable, since it would not provide her any coverage for the years that the premiums cover"); R. 10.12 (3/27/09 testimony

before the hearing officer that the petitioner "did not feel it was [her] responsibility to pay back the premiums for something that [she] never received," and "it wasn't [her] fault that [she] didn't have the insurance")). What the petitioner and her counsel have consistently requested, and urged that the statute requires, is "to treat Ms. Goodrich now as though she were a new employee entitled for the first time to coverage." (R. 15.3, 4/28/09 Br. of Pet. to MPERS.) The court accordingly turns to the allegations that the board's actions in implementing and applying former Rule 601[11] are contrary to the provisions of the statutes providing state employees and teachers with GLI.

A "regulation cannot stand if it is not in accord with the underlying statute. Insofar as rules promulgated by subordinate authority tend to contravene the provisions of controlling law, such rules and regulations are of no effect and will be promptly declared invalid." *Cent. Me. Power Co. v. Pub. Util. Comm'n*, 458 A.2d 739, 741 (Me. 1983) (quotation and ellipsis omitted).

> Likewise, although deference is due the interpretation of a statute by the agency charged with its administration, such deference "must yield to the fundamental approach of determining the legislative intent, particularly as it is manifest in the language of the statute itself. This intent, once revealed, prevails."

*Id.* (quoting *Cent. Me. Power Co. v. Me. Pub. Util. Comm'n, Me.*, 436 A.2d 880, 885 (1981)) (ellipsis omitted).

The legislature has clearly stated its intent regarding the broad purposes underlying MPERS's existence:

> It is the intent of the Legislature to encourage qualified persons to seek public employment and to continue in public employment during their productive years. It is further the intent of the Legislature to assist these persons in making provision for their retirement years by establishing benefits reasonably related to their highest earnings and years of service and by providing suitable disability and death benefits.

---

[11] Although MPERS's board applied former Rule 601 to the petitioner, the analysis of whether former Rule 601 is contrary to law applies to current Rule 601(4)(4) as well, since the opposed requirements of payment of back premiums or evidence of insurability are present in the current version as well.

5 M.R.S. §17050 (2010). As to the availability of GLI, the legislative intent has likewise been expressed. "Life insurance and accidental death and dismemberment insurance, referred to as "basic insurance," must be available to all eligible participants." 5 M.R.S. §18056 (2010); *see also* 5 M.R.S. §18055 (2010). "All employees eligible for basic insurance under this subchapter are automatically insured for the amounts of basic coverage applicable under this subchapter, beginning on the first day of the month following one month of employment after the employee becomes eligible." 5 M.R.S. §18058(1) (2010). Although supplemental and dependent insurance may require evidence of insurability under 5 M.R.S. §18058(1)(C) if an employee's GLI application is untimely, that requirement is not statutorily imposed upon the "basic insurance" which applies to the employee "automatically."

The legislature has thus clearly expressed its intent to provide death and disability benefits to state workers, and specifically, to ensure that GLI is available to all participants who are "eligible" on the basis of their employment without requiring any evidence of insurability, and that such coverage is automatic.

MPERS asserts, "Section 18058(2) does not address the situation where a newly eligible employee is not offered the timely opportunity to apply, or when an employee wishes GLI coverage many years after first eligibility. However, Rule 601 was adopted to address this very situation." (Br. of Resp. at 11.) It explains,

> Rule 601 provides the only means to restore the member to the same position she would have been in, had the premiums been paid when first becoming eligible. The same position, with respect to [the option to pay back premiums], necessarily means that the member pays the premiums retroactively to her eligibility date. This payback of historical payments attempts to mimic the circumstances when the automatic coverage was first offered.

(Br. of Resp. at 9.) MPERS then adds a footnote:

24

> Typically, when a new employee first become[s] eligible, that employee is young and healthy, which is one reason why no evidence of insurability is required. As the employee ages, health concerns may occur, but the insurer has had the benefit of the past premiums paid, before expenditures on behalf of the employee are required.

(Br. of Resp. at 9 n.7.)[12]

Although the regulation purports to fill a blank left by the statute, the court finds and rules that the requirement of back premium payments, as applied to an employee who learns years after her initial eligibility for GLI that she is eligible for such coverage, is contrary to the legislature's intent and is therefore unenforceable. This finding is based first upon the language of the statute that is applicable to a person in the petitioner's position, and second upon the sole instance in 5 M.R.S. §18058 where the legislature specifically provided for the fate of an employee who discontinues coverage due to nonpayment of premiums, but who is not an employee who has cancelled or refused coverage.

The court notes first that the legislature expressly established that basic GLI would necessarily and automatically be available to all public employees in the petitioner's position, and that the employee's written refusal of this coverage was required to be provided to both MPERS and the public employer. 5 M.R.S. §18058(2); cf. 5 M.R.S. §17054-A (2010) (establishing the responsibilities of public employers and MPERS as to employees' election of retirement membership status, and as to the records of such election). Automatic initial GLI coverage is not inconsistent with the court's finding above that such coverage will lapse if premiums are not tendered, but it is inconsistent with a requirement that an employee pay eleven years' worth of premiums for a benefit that she did not receive before being considered eligible

---

[12] The court notes that this justification is potentially at odds with another portion of former Rule 601, which provides, "An employee who has refused [GLI] coverage and who separates from employment and is subsequently reemployed is considered to be eligible as though this were his initial employment and is not required to file evidence of eligibility," as long as certain provisions (primarily regarding bona fide separation and rehiring) were met. Fmr.94-411 Ch. 601(3)(D).

for GLI coverage. The legislative intent of automatic employee GLI coverage and eligibility is not compatible with MPERS's regulatory requirement of payment of back premiums for years when the petitioner did not have GLI.[13]

The most compelling evidence, however, that the legislature's intent is incompatible with the regulation is set forth 5 M.R.S. § 18058(2)(D), where the legislature, rather than leave the specifics of coverage to the agency as they did in most other cases,[14] affirmatively provided what it wished to happen in a specific type of case where an employee allows his or her coverage to lapse during a period of absence, and then returns and wishes to resume coverage. That provision states in full:

> Any employee who, during a period of unpaid military leave of absence, does not continue coverage while on unpaid military leave must be reinstated to the levels of coverage in effect immediately prior to the unpaid military leave. A request for reinstatement by the employee must be made within 31 days of the employee's return to work following unpaid military leave. An employee who wants to be reinstated and who does not apply for reinstatement within 31 days of the employee's return to work from unpaid military leave must produce evidence of insurability at the employee's own expense and in accordance with the requirements of the insurance underwriter.

5 M.R.S. § 18058(2)(D) (2010). Thus, in the instance where the legislature actively dictated the result of a temporary loss of coverage due to an omission of premium payments while on military leave and thus away from eligible employment, it provided that coverage could be resumed, without payment of back premiums or evidence of insurability, within a thirty-one day period of the employee's return to work. Although the legislature did not provide specifically for the petitioner's situation, where the public employer's omission resulted in a failure of premium payments and a resultant lack of coverage, the legislature has covered the situations it envisioned

---

[13] The court is skeptical of the rationale MPERS advances in support of the back premium requirement, but declines to evaluate the regulation's reasonableness in light of the court's finding that the regulation is contrary to law.

[14] Cf. 5 M.R.S. §18055(4) (requiring retirees who return to coverage-eligible employment to bear the cost of the new coverage, and requiring that MPERS establish a method for such payments).

26

in the following ways: upon beginning work, the employee has thirty-one days to decide whether to accept the automatic basic GLI coverage and fill out an application authorizing deductions (5 M.R.S. §18058(1)),[15] or to waive the coverage and the deductions, which refusal must be in writing and sent to the employer and MPERS (5 M.R.S §18058(2)). It covers reinsurance of those who have previously refused coverage by mandating evidence of insurability (5 M.R.S. §18058(2)(C)), and, as the court just noted, it requires reinstatement of a returning veteran whose GLI payments and coverage had lapsed during service at the same level the employee had enjoyed prior to military service, without payment of premium for the time lapsed[16] (5 M.R.S. §18058(2)(D)). In the case of both the new hire and the returning veteran, no payment of back premiums or evidence of insurability is required. The court finds and rules that the regulation requiring payment of eleven years' worth of back premiums before providing prospective coverage to an employee who had not known that GLI coverage was available to her, and who was denied coverage due to her employer's error, is inconsistent with the legislative intent. The legislative "intent, once revealed, prevails," and the regulation inconsistent with this intent cannot stand. *Cent. Me. Power Co.*, 458 A.2d at 741 (Me. 1983) (quotation omitted); *compare with Baker*, 2010 ME 87, ¶15, 3 A.3d at 385 (affirming a board regulation where "the consequences of the new rule are not in conflict with the statute").

The choice MPERS offered the petitioner in its September 2006 letter notifying her of her eligibility for GLI coverage was therefore unenforceable as inconsistent with the legislature's intent. The court finds, in light of its analysis of the legislature's intent in 5 M.R.S. §18058, that

---

[15] And an untimely application will result in a requirement of evidence of insurability as to supplemental or dependent insurance (5 M.R.S. §18058(1)(C)), but not basic insurance, which continues without premium payments into a thirty-one day grace period before lapsing (94-411 Ch. 601(4)(A) (1979); 94-411 Ch. 601(4)(1) (2008)).

[16] Or the risks to long-term health incurred during combat, counter to the "young and healthy employee" rationale MPERS advanced to support the necessity of back premium payments for reinstatement of an employee whose lapsed payments were due to an error on the part of MPERS or the public employer.

the petitioner should have been treated like a new hire (or a returning veteran), and offered thirty-one days to decide whether to accept the automatic coverage and authorize deductions to pay for her prospective coverage (including the option to opt into supplemental and dependent coverage without evidence of insurability, as new hires are provided under 5 M.R.S. §18056(2) and (3)), followed by a thirty-one day grace period during which she could "rescue" her basic coverage, if not her supplemental and dependent coverage, by making the premium payments and tendering her application. The distinction between an option to join GLI as a new member[17] and an option to join upon payment of back premiums cannot be overstated. In the present case, the petitioner was clear that her delay in responding to the notification of her eligibility was due to her reluctance to pay eleven years' worth of back premiums.

Because the option offered to the petitioner in the September 2006 letter was inconsistent with the statutory scheme, the court reverses the ruling of MPERS's board. The court notes that it is unusual for MPERS to be the entity that alerts an employee to the availability of GLI, as the statute contemplates that the public employer will have this task, as well as the task of withholding payment for premiums. However, as MPERS was the entity to originally notify the petitioner, and as MPERS is the party to the 80C appeal, it seems appropriate that MPERS should be the entity to inform the petitioner of her right, consistent with the court's findings of legislative intent, to GLI coverage upon payment of prospective premiums, and should supply her with the necessary forms and applications. The petitioner should also ensure that her employer receives the necessary forms and applications to complete the withholding and the correspondence with MPERS contemplated by the statute and the regulation.

---

[17] The court understands that the petitioner may wish to have the option of purchasing years of past GLI coverage for the purpose of retirement. (See Br. of Pet. at 11-12.) The court does not rule on that issue, and the question of the petitioner's ability to purchase coverage for those years when she was eligible but not covered is to be settled between her and MPERS in the first instance.

28

The entry will be:

The decision of the MPERS board of trustees denying Ms. Goodrich GLI coverage is REVERSED. The matter is REMANDED to the board for proceedings consistent with this order.

This order may be noted on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

3/17/11

**DATE**

**SUPERIOR COURT JUSTICE**

Date Filed __3/4/10__ ____Kennebec____ Docket No. __AP-10-11__
                          County

Action __Petition For Review__
                 80C                              J. Murphy

Ellen M. Goodrich                    Board of Trustees, ME Public Employees
                            vs.                  Retirement System

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Donald F. Fontaine, Esq.<br>PO Box 7590<br>Portland, ME  04112-7590 | Christopher L. Mann, AAG<br>6 State House Station<br>Augusta, ME  04333-0006 |

| Date of Entry | |
|---|---|
| 3/5/10 | Petition, filed.  s/Fontaine, Esq.   (filed 3/4/10) |
| 3/5/10 | Letter entering appearance, filed.  s/Mann, AAG |
| 3/31/10 | Certified Administrative Record, filed.  s/Poland, Appeals Clerk<br>**NOTICE AND BRIEFING SCHEDULE ISSUED**<br>Copies mailed to attys. of record. |
| 4/14/10 | Motion to Require or Permit Corrections to the Record and Incorporated Memorandum of Law, filed. s/Fontaine, Esq.<br>Proposed ORder, filed. |
| 4/28/10 | Motion in Response to Modifying the Certified Record, filed. s/Mann, Esq. |
| 5/5/10 | Petitioner's response to Respondent's Motion in Response to Modify the Certified Record, filed. s/Fontaine, Esq. |
| 5/7/10 | MOTION IN RESPONSE, Marden, J.<br>Improper Title in Motion. Try Response.<br>Copies to attys. of record.<br><br>ORDER TO SUPPLEMENT THE RECORD, Marden, J.<br>Motion Denied. Oral argument is not evidence if decision is not supported by the evidence. The court will--- |
| 5/10/10 | Consented to Motion for the Enlargement of Time to File Opponent's Brief, filed. s/Fontaine, Esq.<br>Proposed Order, filed. |
| 5/10/10 | ORDER, Marden, J.<br>The Court having reviewed the petitioner's Motion for Enlargement of Time, and having noted that there is no opposition thereto, it is hereby ORDERED that petitioner's appeal brief shall be due May 24, 2010.<br>Copies to attys. of record. |

| Date of Entry | Docket No. |
|---|---|
| 5/21/10 | Brief on Appellant Ellen M. Goodrich, filed. s/Fontaine, Esq. |
| 6/21/10 | Opposition to Petitioner's 80C Petition, filed. s/Mann, AAG |
| 7/7/10 | Petitioner's Reply Brief, filed. s/Fontaine, Esq. |

Notice of setting for 9/9/10 sent to attorneys of record.

| | |
|---|---|
| 9/22/10 | Letter filed by Atty Fontaine regarding hearing on 9/9/10. (filed 9/14/10) |
| 3/17/11 | ORDER ON APPEAL OF ADMINISTRATIVE ACTION PURSUANT TO RULE 80C, Murphy, J.<br>The decision of the MPERS board of trustees denying Ms. Goodrich GLI coverage is REVERSED. The matter is REMANDED to the board for proceedings consistent with this order.<br>This order may be noted on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.<br>Copy to Atty Fontaine and AAG Mann. |
| 3/17/11 | Notice of removal of exhibits and/or record mailed to attorneys. |